UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RONALD J. FRIEDMAN, ESQ.,

as Receiver for New York Merchants Protective
Co., Inc., a New York corporation; New York
Merchants Alarm Response, Inc., a Delaware
corporation, and NY Merch Prot Co., Inc.,
a Delaware corporation,

                            Plaintiff,

      - against -

WAYNE WAHRSAGER, AARON WAHRSAGER,
ERIC R. WAHRSAGER, NATIONWIDE CENTRAL
STATION MONITORING CO., INC.,
NEW YORK MERCHANTS PROTECTIVE CO, INC.,
NMP HOLDINGS CORP., NATIONWIDE DIGITAL
MONITORING CO., INC., UNITED STATES
MERCHANTS PROTECTIVE CO., INC., NEW
YORK MERCHANTS ALARM RESPONSE, INC.,
NY MERCH PROT CO., INC., and
SENIORCARE911, LLC,

                            Defendants.
-----------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y
★ FEB 1 ʊ 2011 ★
LONG ISLAND OFFICE

Case No. __-cv-__

Senior District Court Judge
Denis R. Hurley

**CV - 11  0815**

HURLEY, J.

WALL, M.J.

## COMPLAINT

Plaintiff Ronald J. Friedman, Esq., as the Receiver for New York Merchants Protective Co., Inc., a New York Corporation, New York Merchants Alarm Response, Inc., a Delaware corporation, and NY Merch Prot Co., Inc., a Delaware corporation (the "Receiver"), by his attorneys, Silverman Acampora LLP, complaining of the defendants, alleges as follows:

### NATURE OF THE ACTION

1.      For at least the past six (6) months, defendants have all engaged in a two-pronged scheme whereby they caused defendant New York Merchants Protective Co., Inc. ("NYMP") to transfer a significant portion of its assets to Nationwide Central Station Monitoring Co., Inc. ("Central Station") for no consideration in an effort to prevent Bank of America, N.A. ("Bank of America"), its secured creditor, from recovering upon its $17,500,000 unpaid loan to

1

NYMP. Simultaneously with that fraudulent conveyance, defendants intentionally sabotaged, *and continue to sabotage to this day*, the remaining business of NYMP for the express purpose of rendering any judgment obtained by Bank of America or the Receiver avoiding the fraudulent conveyance moot.

2.      By the within action, the Receiver seeks judgment against defendants, *inter alia* (a) permanently enjoining and restraining each of them, their attorneys, employees, representatives, affiliates, subsidiaries, successors, assigns, and all those acting in concert with them from either affirmatively taking any action, or from neglecting to take any action, that would harm, injure, or cause any damage to the operations, business, reputation, good will, assets, relationships, or other intangibles of NYMP, New York Merchants Alarm Response, Inc., and NY Merch Prot Co., Inc., (b) for an order expanding the Receiver's powers to include having full unfettered access and disclosure of the entirety of the operations of Central Station, including, but not limited to having access to its Sedona Office program and data, its MAS program and data, the logs on all calls made into Central Station, access to its mail and post office box(es), access to its customer files, access to all employee and owner computers including laptops, having the Receiver and his paid professionals have full and complete access to the property where Central Station and NYMP operate side-by-side twenty-four (24) hours a day, seven (7) days a week, and having access to all security camera feeds at the location where Central Station and NYMP operate side-by-side, (c) setting aside the conveyance of the Fraudulently Conveyed assets of NYMP to Central Station, and (d) declaring that the assets of NYMP that were fraudulently conveyed to Central Station are subject to the perfected security interest of Bank of America.

### THE RELATED PROCEEDINGS

3.      On January 5, 2011, Bank of America commenced a civil action in this Court entitled *Bank of America, N.A. v. New York Merchants Protective Co., Inc., a New York corporation, New York Merchants Alarm Response Inc., a Delaware corporation, and NY Merch*

**2**

*Prot Co., Inc. a Delaware corporation*, 11 CV 00038 (the "BofA Action"). The BofA Action was assigned to District Court Judge Denis Hurley. A copy of the complaint in the BofA Action is annexed hereto and made a part hereof as **Exhibit 2**.

4. Simultaneous with the commencement of the BofA Action, Bank of America filed a motion with the Court seeking the appointment of a receiver. A hearing was held on January 5, 2011, at which time the Receiver was appointed, with limited powers.

5. Thereafter, Judge Hurley expanded the powers of the Receiver by order dated January 19, 2011. Copies of all of the orders related to the appointment of the Receiver are annexed hereto collectively and made a part hereof as **Exhibit 1** (all of the orders signed by Judge Hurley are collectively referred to herein as the "Order Appointing Receiver").

6. The Receiver has duly qualified, and has filed a bond in compliance with the orders of Judge Hurley, and is, and has been operating as Receiver since January 5, 2011.

## PARTIES

7. At all relevant times mentioned herein, the Receiver is an attorney duly admitted to practice law before the Courts of this State, and maintains a principal place of business at Silverman Acampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York.

8. Upon information and belief, and at all relevant times mentioned herein, Wayne Wahrsager was and still is an individual residing in Nassau County, New York.

9. Upon information and belief, and at all relevant times mentioned herein, Aaron Wahrsager was and still is an individual residing at 1911 Allison Drive, Bellmore, Nassau County, New York.

10. Upon information and belief, and at all relevant times mentioned herein, Eric R. Wahrsager was and still is an individual residing at 403 East Boardwalk, Unit 302, Long Beach, Nassau County, New York.

11. Upon information and belief, and at all relevant times mentioned herein, Central Station was and still is a corporation organized and existing under the laws of the State of New

**3**

York and maintains a principal place of business in Nassau County, New York.

12. Upon information and belief, and at all relevant times mentioned herein, NYMP was and still is a corporation organized and existing under the laws of the State of New York and maintains a principal place of business in Nassau County, New York.

13. Upon information and belief, and at all relevant times mentioned herein, New York Merchants Alarm Response, Inc. was and still is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Nassau County, New York.

14. Upon information and belief, and at all relevant times mentioned herein, NY Merch Prot Co., Inc. was and still is a corporation organized and existing under the laws of the State of New York and maintains a principal place of business in Nassau County, New York.

15. Upon information and belief, and at all relevant times mentioned herein, NMP Holdings Corp. was and still is a corporation organized and existing under the laws of the State of New York and maintains a principal place of business in Nassau County, New York.

16. Upon information and belief, and at all relevant times mentioned herein, Nationwide Digital Monitoring Co., Inc. was and still is a corporation organized and existing under the laws of the State of New York and maintains a principal place of business in Nassau County, New York.

17. Upon information and belief, and at all relevant times mentioned herein, United States Merchants Protective Co., Inc. was and still is a corporation organized and existing under the laws of the State of New York and maintains a principal place of business in Nassau County, New York.

18. Upon information and belief, and at all relevant times mentioned herein, SeniorCare911, LLC was and still is a corporation organized and existing under the laws of the State of Delaware, and maintains a principal place of business in Nassau County, New York.

**4**

## VENUE AND JURISDICTION

19.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1367 because this action is related to the claims filed in the BofA Action.

20.     Venue is proper in this Court based on 28 U.S.C. §1391 because a substantial portion, if not all, of the events giving rise to the claims for relief alleged herein occurred within the Eastern District of New York.

## CORPORATE HISTORY

21.     NYMP was formed on January 12, 1989 by Wayne Wahrsager and Mark Fischer. Kenneth Kirschenbaum, Esq., of Kirschenbaum & Kirschenbaum, P.C. is the attorney that assisted them in the corporate formation.

22.     From the date of its formation, NYMP has been in the business of "protecting life and property" by providing security alarm, fire alarm, and life safety monitoring, together with all related services including, but not limited to central station monitoring.

23.     Mr. Kirschenbaum and his firm have acted as general counsel for NYMP since the date of its formation.

24.     From the date of its formation, through 2003, NYMP expanded and grew its business by purchasing smaller security companies using Mr. Kirschenbaum as counsel and his firm in those transactions.

25.     In many instances, Mr. Kirschenbaum's firm represented both sides of the transaction, ostensibly obtaining conflict "waivers" from all parties, while still simultaneously representing NYMP as general counsel.

26.     On November 29, 2003, NYMP entered into an agreement with Nationwide Digital, Inc. ("Digital") which, at that time, was a corporation owned by Peter Deck, Meryle Deck (the "Decks"), Edward Hart, and Dolores Hart (the "Harts") (the "2003 Agreement").  A copy of the 2003 Agreement is annexed hereto and made a part hereof as **Exhibit 3**.

RJA/849331.2/059814

27.    Mr. Kirschenbuam drafted the 2003 Agreement, represented all parties in that transaction, despite the obvious conflict of interest, and acted as a broker for the transaction. Paragraph 19 of the 2003 Agreement provides

> The parties agree that Kenneth Kirschenbaum has acted as counsel for NYM and has also acted as counsel for N, although N has also engaged separate counsel to advise N and the Decks, such counsel wishing to have his name omitted from this agreement. The parties acknowledge that in addition to acting as counsel, Kenneth Kirschebaum has acted as broker in making the introduction and structuring the relationship between the parties to this transaction. The parties agree that Kenneth Kirschebaum shall receive a broker's commission in the amount of $115,000.00, payable $1000 per month commencing on the first day of fourth month [sic] following the date NYM takes over the monitoring. NYM and N shall each pay $500 per month. . . The parties waive any conflict of interest, apparent, actual, perceived, known or unknown, that Kenneth Kirschenbaum or Kirschenbaum & Kirschenbaum PC does or may have by reason of acting as counsel or broker in this transaction.

Paragraph 21 of the agreement further states in relevant part

> The parties acknowledge that both have been represented by Kenneth Kirschenbaum and Kirschenbaum & Kirschenbaum PC for various matters that are unrelated to this agreement, and in connection with this agreement, and that both parties consent that no conflict of interest exists, and to the extent that such conflict exists the parties waive such conflict.

28.    The 2003 Agreement provided, *inter alia*, that NYMP would provide all alarm monitoring, billing and collection services to Digital for its dealers.

29.    Pursuant to the 2003 Agreement, Digital was to perform sales and marketing for Digital's nationwide wholesale monitoring business.

30.    The 2003 Agreement further provided that NYMP would receive 60% of the revenue from that business and that Digital would receive the other 40%, until the annual revenue reached $1,198,000 when the revenue would then be shared equally.

31.    On December 11, 2003, NYMP and Digital entered into a modification of the 2003 Agreement whereby Kenneth Kirschenbaum, Esq. loaned NYMP $200,000.

6

32.     Simultaneously therewith, Mr. Kirschenbaum filed UCC-1 Financing Statements whereby Mr. Kirschenbaum purportedly obtained a security interest in and to all of the assets of his clients, NYMP and Digital. **Exhibit 4**.

33.     Almost immediately after entering into the 2003 Agreement, NYMP, through Mr. Kirschenbaum, filed a Certificate of Assumed Name with the New York Secretary of State, so that NYMP would also be known as <u>Nationwide Digital Company</u>, a d/b/a that is very similar to Digital's corporate name, <u>Nationwide Digital, Inc.</u>

34.     The Certificate of Assumed Name was changed by Mr. Kirschenbaum's firm on January 13, 2004 to <u>Nationwide Digital Monitoring Company</u>, a d/b/a that is also very similar to Digital's corporate name, <u>Nationwide Digital, Inc.</u>.

35.     On or about March 12, 2004, Digital, the Harts, the Decks and NYMP entered into an agreement whereby, among other things, Digital repurchased the Harts' 50% interest in Digital and subsequently, upon information and belief, Digital transferred that 50% interest in Digital to NYMP (the "2004 Stock Transfer Agreement"). A copy of the 2004 Stock Transfer Agreement is annexed hereto and made a part hereof as **Exhibit 5**.[1]

36.     Thereafter, on or about May 4, 2004, all of the parties to the 2003 Agreement modified that Agreement (**Exhibit 6**).

37.     Upon information and belief, subsequent to May 4, 2004, NYMP transferred its 50% interest in Digital to Mark Fischer (25%), Eric R. Wahrsager (12.5%), and Aaron Wahrsager (12.5%).

38.     In 2005, two years after the 2003 Agreement was entered into between Digital and NYMP, Wayne Wahrsager, with the assistance of Mr. Kirschenbaum's office, formed

---

[1]  In addition to the stock transfer, the Harts and Decks agreed to sell property jointly owned by them. Kenneth Kirschenbaum represented <u>all</u> parties to that transaction, and received attorneys' fees from the proceeds of that sale.

7

Nationwide Digital Monitoring Co., Inc. in Delaware ("Monitoring")[2]. That corporate name is very similar to Digital's corporate name, Nationwide Digital, Inc.

**The Bank of America Loans to NYMP**

39.     On January 31, 2006, Bank of America (through its predecessor LaSalle Bank, National Association) entered into a lending agreement with defendants in the BofA Action by which Bank of America provided those defendants with a loan facility of up to $17.5 million.[3]

40.     Among other things, since January 31, 2006, and continuing to date, Bank of America has a first priority perfected security interest in and to all of the assets of NYMP including not only the assets it had on January 31, 2006, but also any assets it has acquired subsequently.

**The 2008 Litigations**

41.     In 2008, at least three (3) litigations were initiated between various defendants in this action and the Decks.

42.     On June 2, 2008, NYMP and others commenced a litigation in the Supreme Court, Nassau County against Peter Deck entitled *New York Merchants Protective Co., Inc., d/b/a Nationwide Digital Monitoring Company, Nationwide Digital Co., Inc. and SeniorCare911, LLC v. Peter Deck*, Nassau County Index No. 10114/08.

43.     In that action, plaintiffs alleged, *inter alia*, that Peter Deck had tortiously interfered with existing contracts and existing business relationships.  Upon information and belief, that action was discontinued by stipulation among the parties and filed with the Nassau County Clerk on September 30, 2008.

44.     On August 8, 2008, Marc Fisher, Eric R. Wahrsager, and Aaron Wahrsager commenced a dissolution action against the Decks in the Supreme Court, Richmond County

---

[2] Monitoring is a wholly owned subsidiary of NYMP (**Exhibit 7**).

[3] The three defendants in the BofA Action are NYMP, New York Merchants Alarm Response, Inc. and NY Merch Prot Co., Inc.

RJA/849331.2/059814

entitled *The Petition of Mark Fischer, Eric Wahrsager, Aaron Wahrsager, individually and on behalf of Nationwide Digital, Inc. v. Peter Deck and Meryle Deck* under Richmond County Index No. 80245/08 (the "Dissolution Action").

45.     On or about September 19, 2008, the Decks, in their individual capacity and as shareholders of Digital, commenced a derivative action entitled *Peter Deck and Meryle Deck, individually and as shareholders of Nationwide Digital, Inc., suing on behalf of themselves and all other shareholders of Nationwide Digital, Inc. so situated, and in the right of Nationwide Digital, Inc. v. Nationwide Digital, Inc, Wayne Wahrsager, Aaron Wahrsager, Mark Fischer, Eric Wahrsager, New York Merchants Protective Co., Inc., Nationwide Digital Co., Inc., SeniorCare911, LLC, and Nationwide Digital Monitoring Co., Inc.* under Nassau County Index No. 17763/08 the ("Derivative Action").

46.     The Dissolution Action and Derivative Action were consolidated in the Supreme Court, Nassau County, and ultimately, those cases, as consolidated, were settled pursuant to a "so ordered" Stipulation dated February 26, 2009, a copy of which is annexed hereto and made a part hereof as **Exhibit 9** (the "Settlement Stipulation").

47.     Under the Settlement Stipulation, the Decks, as assignors, assigned certain assets of Digital to the "Assignees", who are defined as Wayne Wahrsager, Aaron Wahrsager, Mark Fischer, Eric Wahrsager, NYMP, SeniorCare911, LLC, and Monitoring.

48.     Specifically, the Decks assigned to the Assignees (the "Assignment"), certain phone numbers, Digital's website, Digital's customer list, Digital's accounts and receivables, and certain intellectual property (the "Assigned Assets").  A copy of the Assignment is annexed hereto and made a part hereof as **Exhibit 10**.

49.     In consideration for the Assigned Assets, the Decks were to be paid $1,150,000. The first $50,000 was paid at the time the Settlement Stipulation and Assignment were executed with the balance of $1,100,000 to be paid in thirty-six (36) monthly installments commencing April 1, 2009.

9

50. Despite the fact that the Assigned Assets were assigned to all of the Assignees, only NYMP funds paid for those Assigned Assets from February 2009 through October, 2010.

**Central Station is Formed Seven (7) Months After the Assignment**

51. Central Station was formed on September 30, 2009, seven (7) months after the Settlement Stipulation was signed, and seven (7) months after the Assigned Assets were transferred to the Assignees.

52. Central Station was not a party to the Settlement Stipulation.

53. Central Station is not an Assignee under the Assignment.

54. Upon information and belief, Central Station was formed by Eric R. Wahrsager and Aaron Wahrsager.

55. At the time that Central Station was formed, Eric R. Wahrsager and Aaron Wahrsager were officers of NYMP.

56. Upon information and belief, currently, Eric R. Wahrsager and Aaron Wahrsager each own 50% of the equity in Central Station.

## DEFENDANTS SABOTAGE NYMP

**Defendants' Sabotage *Before* the Commencement of the BofA Action**

57. Before Bank of America commenced the BofA Action, defendants took several steps from at least August 2010 through January 5, 2011 (the "Prelitigation Period") to intentionally sabotage the business and operations of NYMP.

58. Throughout of the Prelitigation Period, Wayne Wahrsager was an owner of NYMP. Upon information and belief, Wayne Wahrsager was a director of NYMP during the same period.

59. During almost the entirety of the Prelitigation Period, Eric Wahrsager was an officer and an employee of NYMP. Eric Wahrsager resigned in or around December 28, 2010 from NYMP.

**10**

60.     During almost the entirety of the Prelitigation Period, Aaron Wahrsager was an officer and an employee of NYMP (Wayne Wahrsager, Eric R. Wahrsager, and Aaron Wahrsager are referred to herein collectively as the "NYMP Officers").

61.     Upon information and belief, during the Prelitigation Period, the NYMP Officers purposely caused NYMP to default on its obligations to its landlord 7375 West Merrick Road LLC, an entity owned 60% by a trust controlled by Kenneth Kirschenbaum, 20% by Kenneth Kirschenbaum in his individual capacity, 10% by Wayne Wahrsager, and 10% by Mark Fischer, by not paying $10,000 rent due on November 1, 2010.

62.     During the Prelitigation Period, the NYMP Officers purposely caused NYMP to default on its obligations to its landlord by not paying its portion of the real estate taxes due under its lease with the landlord.

63.     During the Prelitigation Period, the NYMP Officers caused NYMP to surrender its lease to its landlord for no consideration, notwithstanding substantial tenant improvements.

64.     During the Prelitigation Period, the NYMP Officers caused NYMP to enter into a new lease with Central Station.  Thus, in its current construct, Central Station is NYMP's landlord.  7375 West Merrick Road LLC became the landlord for Central Station at the same time.

65.     During the Prelitigation Period, the NYMP Officers caused NYMP to shred and destroy all of its customer contracts.

66.     During the Prelitigation Period, the NYMP Officers caused NYMP to transfer a significant portion of its assets to Central Station for no consideration (the "Fraudulently Conveyed Assets").

67.     The Fraudulently Conveyed Assets are comprised of not only the Assigned Assets, but also include certain NYMP customer accounts.  All of the foregoing are subject to Bank of America's perfected security interest (**Exhibit 8**).

11

68.    In addition to transferring the Fraudulently Conveyed Assets, NYMP purportedly signed an agreement whereby it obligated itself to Central Station to pay $50,000 per month for monitoring of NYMP's customer accounts.

69.    Pursuant to the purported agreement (the "November 5, 2010 Agreement" **Exhibit 13**), Central Station was to provide central station monitoring services for NYMP's 8,261 accounts ($6.05 per month per account).

70.    Upon information and belief, the rate of $6.05 per month per account is more than 150% of the market rate of $3.00 per month per account.

71.    Because of the foregoing deliberate and other acts of sabotage, NYMP is currently losing residential customers on a continuing and daily basis.

72.    The Receiver has demanded information concerning the number of accounts Central Station is monitoring for NYMP.

73.    Despite due demand, Central Station has failed to timely provide the Receiver with that critical information.

74.    During the Prelitigation Period, the NYMP Officers disseminated to its residential customers a letter by which NYMP unilaterally terminated customer monitoring contracts, and advised the customers that NYMP was "releasing you immediately from the remaining term of your obligation under your contract. As of today your agreement with our company will be on a month to month basis and you will be able to cancel at any time by giving 30 days written notice. . ." (the "Cancelation Letter")(**Exhibit 11**).

75.    The Cancelation Letter contained defendant Wayne Wahrsager's personal cell phone number and invited customers to call him in the event they had "any questions."

76.    During the Prelitigation Period, the NYMP Officers formed new corporate entities and renamed existing entities for the purpose of attempting to hide and conceal the acts of sabotage.

**12**

77.     During the Prelitigation Period, the NYMP Officers on or about January 4, 2011, the day before the BofA Action was commenced, changed the name of NYMP to NMP Holdings Corp.(**Exhibit 12**).

78.     During the Prelitigation Period, the NYMP Officers on or about January 4, 2011, the day before the BofA Action was commenced, formed a "new" corporate entity named NYMP – the same as the "old" entity that is the primary obligor to Bank of America, N.A.   Upon information and belief, Eric R. Wahrsager was and still is an owner of the "new" NYMP.

**Defendants' Sabotage Continues *After* Commencement of the BofA Action**

79.     In addition to the acts of sabotage committed by defendants in the Prelitigation Period, defendants have continued to sabotage the business and operations of NYMP after the commencement of the BofA Action, and after the appointment of the Receiver.

80.     Since the appointment of the Receiver, and in violation of the Order Appointing Receiver, defendant Eric R. Wahrsager has on at least ten (10) occasions called existing customers of NYMP to advise them that their security and fire alarm monitoring was being turned off with no prior notice.

81.     Since the appointment of the Receiver, and in violation of the Order Appointing Receiver, the NYMP Officers continue to send out the Cancelation Letter to existing customers.

82.     Upon information and belief, since the appointment of the Receiver, and in violation of the Order Appointing Receiver, Eric R. Wahrsager continues to send out the Cancelation Letter to existing customers.

83.     Since the appointment of the Receiver, and in violation of the Order Appointing Receiver, the NYMP Officers continue to interfere with and hinder the ability of the Receiver and his retained professionals to operate NYMP, including, but not limited to (i) cancelling customer accounts and moving them from NYMP to Central Station, and (ii) turning access to NYMP's computer system off so that the Receiver and his professionals have no access to the operations of NYMP.

**13**

84.    Upon information and belief, since the appointment of the Receiver, and in violation of the Order Appointing Receiver, the NYMP Officers are sending former salesmen of NYMP to NYMP customers in an attempt to cause those customers to switch accounts and sign up with Central Station.

85.    Since the appointment of the Receiver, and in violation of the Order Appointing Receiver, the NYMP Officers have purposely and intentionally destroyed data on NYMP servers and has intentionally "wiped" one of those computer servers (wiping involves installing a program that systematically and purposely writes over all of the existing data with blank data so that the computer server is restored to the condition it was in at the time of its manufacture, that is, completely blank) to prevent the Receiver and his professionals from operating the business of NYMP.

## FIRST CLAIM FOR RELIEF AGAINST WAYNE WAHRSAGER
(incorporating all prior allegations)

86.    At all relevant times, Wayne Wahrsager was an officer and director of NYMP, owed a duty to NYMP to carefully manage NYMP's business operations, to devise, implement and maintain proper controls with respect to NYMP's business operations, and financial affairs, and to insure that NYMP's business, as conducted by its employees and representatives, complied with all laws applicable to NYMP's industry and to lawful businesses in general.

87.    Wayne Wahrsager neglected and failed to perform his duties as an officer and director of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets by failing to preserve and protect the assets of NYMP.

88.    Rather, by sabotaging the value of NYMP's assets, and by hiding and secreting NYMP's assets, Wayne Wahrsager participated in improper activities for his own personal gain, and the personal gain of his sons, defendants Eric R.  Wahrsager and Aaron Wahrsager, to the detriment of NYMP.

**14**

89.     As a direct result of Wayne Wahrsager's actions, NYMP has engaged in activities that have resulted in significant damage to NYMP including, but not limited to, substantial losses of funds, and diversion of funds to Wayne Wahrsager, Eric R. Wahrsager, Aaron Wahrsager, and Central Station.

90.     Wayne Wahrsager further neglected and failed to perform his duties as an officer and director of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged NYMP's corporate assets by failing to take action to preserve and safeguard NYMP's resources and recklessly and negligently dissipated such resources.

91.     As a result of the foregoing misconduct by Wayne Wahrsager, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### SECOND CLAIM FOR RELIEF AGAINST WAYNE WAHRSAGER
(incorporating all prior allegations)

92.     Wayne Wahrsager, as an officer and director of NYMP, was responsible for the maintenance of NYMP's books and records and owed a fiduciary duty to NYMP and its creditors, as set forth in the New York Business Corporation Law and common law, including the trust fund doctrine established under common law.

93.     Wayne Wahrsager neglected and failed to perform his duties as an officer and director of NYMP in the management and disposition of the NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets.

94.     By reason of the foregoing, Wayne Wahrsager breached his fiduciary duty to NYMP under New York Business Corporation Law §720, and by reason of Wayne Wahrsager's waste and mismanagement, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

**15**

## THIRD CLAIM FOR RELIEF AGAINST ERIC R. WAHRSAGER
(incorporating all prior allegations)

95.     At all relevant times during the Prelitigation Period, Eric R. Wahrsager was an officer of NYMP, owed a duty to NYMP to carefully manage NYMP's business operations, to devise, implement and maintain proper controls with respect to NYMP's business operations, and financial affairs, and to insure that NYMP's business, as conducted by its employees and representatives, complied with all laws applicable to NYMP's industry and to lawful businesses in general.

96.     Eric R. Wahrsager neglected and failed to perform his duties as an officer of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets by failing to preserve and protect the assets of NYMP.

97.     Rather, by sabotaging the value of NYMP's assets, and by hiding and secreting NYMP's assets, Eric R. Wahrsager participated in improper activities for his own personal gain, and the personal gain of his father, Wayne Wahrsager, and his brother, Aaron Wahrsager, to the detriment of NYMP.

98.     As a direct result of Eric R. Wahrsager's actions, NYMP has engaged in activities that have resulted in significant damage to NYMP including, but not limited to, substantial losses of funds, and diversion of funds to Wayne Wahrsager, Eric R. Wahrsager, Aaron Wahrsager, and Central Station.

99.     Eric R. Wahrsager further neglected and failed to perform his duties as an officer of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged NYMP's corporate assets by failing to take action to preserve and safeguard NYMP's resources and recklessly and negligently dissipated such resources.

100.    As a result of the foregoing misconduct by Eric R. Wahrsager, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

16

### FOURTH CLAIM FOR RELIEF AGAINST ERIC R. WAHRSAGER
(incorporating all prior allegations)

101.    Eric R. Wahrsager, as an officer of NYMP, was responsible for the maintenance of NYMP's books and records and owed a fiduciary duty to NYMP and its creditors, as set forth in the New York Business Corporation Law and common law, including the trust fund doctrine established under common law.

102.    Eric R. Wahrsager neglected and failed to perform his duties as an officer of NYMP in the management and disposition of the NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets.

103.    By reason of the foregoing, Eric R. Wahrsager breached his fiduciary duty to NYMP under New York Business Corporation Law §720, and by reason of Eric R. Wahrsager's waste and mismanagement, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### FIFTH CLAIM FOR RELIEF AGAINST AARON WAHRSAGER
(incorporating all prior allegations)

104.    At all relevant times, Aaron Wahrsager was an officer of NYMP, owed a duty to NYMP to carefully manage NYMP's business operations, to devise, implement and maintain proper controls with respect to NYMP's business operations, and financial affairs, and to insure that NYMP's business, as conducted by its employees and representatives, complied with all laws applicable to NYMP's industry and to lawful businesses in general.

105.    Aaron Wahrsager neglected and failed to perform his duties as an officer of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets by failing to preserve and protect the assets of NYMP.

106.    Rather, by sabotaging the value of NYMP's assets, and by hiding and secreting NYMP's assets, Aaron Wahrsager participated in improper activities for his own personal gain,

**17**

RJA/849331.2/059814

and the personal gain of Wayne Wahrsager, Eric R. Wahrsager, and Aaron Wahrsager, to the detriment of NYMP.

107. As a direct result of Aaron Wahrsager actions, NYMP has engaged in activities that have resulted in significant damage to NYMP including, but not limited to, substantial losses of funds, and diversion of funds to Wayne Wahrsager, Eric R. Wahrsager, Aaron Wahrsager, and Central Station.

108. Aaron Wahrsager further neglected and failed to perform his duties as an officer of NYMP in the management and disposition of NYMP's assets committed to his charge and thereby wasted and mismanaged NYMP's corporate assets by failing to take action to preserve and safeguard NYMP's resources and recklessly and negligently dissipated such resources.

109. As a result of the foregoing misconduct by Aaron Wahrsager, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### SIXTH CLAIM FOR RELIEF AGAINST AARON WAHRSAGER
(incorporating all prior allegations)

110. Aaron Wahrsager, as an officer of NYMP, was responsible for the maintenance of NYMP's books and records and owed a fiduciary duty to NYMP and its creditors, as set forth in the New York Business Corporation Law and common law, including the trust fund doctrine established under common law.

111. Aaron Wahrsager neglected and failed to perform his duties as an officer of NYMP in the management and disposition of the NYMP's assets committed to his charge and thereby wasted and mismanaged such corporate assets.

112. By reason of the foregoing, Aaron Wahrsager breached his fiduciary duty to NYMP under New York Business Corporation Law §720, and by reason of Aaron Wahrsager's waste and mismanagement, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

18

RJA/849331.2/059814

## SEVENTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

113.    NYMP did not receive fair consideration for the Fraudulently Conveyed Assets.

114.    NYMP was either insolvent when it conveyed the Fraudulently Conveyed Assets, or was rendered insolvent as a result thereof.

115.    The Fraudulently Conveyed Assets constitute a fraudulent conveyance in violation of New York State Debtor and Creditor Law §273.

116.    By reason of the foregoing, the Receiver is entitled to a judgment (a) avoiding the transfer of the Fraudulently Conveyed Assets pursuant to New York State Debtor and Creditor Law §273, (b) setting aside the transfer of the Fraudulently Conveyed Assets, and (c) recovering from Central Station an amount to be determined at trial but in no event less than $4,500,000 which is equal to any and all sums paid to or received by Central Station which amount is, in no event, less than $4,500,000 together with interest thereon.

## EIGHTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

117.    NYMP did not receive fair consideration for the Fraudulently Conveyed Assets.

118.    Upon information and belief, at the time that NYMP transferred the Fraudulently Conveyed Assets, NYMP was engaged or about to engage in a business or transaction for which the property remaining in its possession after transferring the Fraudulently Conveyed Assets was unreasonably small capital with which to continue the business and transactions in which NYMP was engaged.

119.    The Fraudulently Conveyed Assets constitute a fraudulent conveyance in violation of New York State Debtor and Creditor Law §274.

120.    By reason of the foregoing, the Receiver is entitled to a judgment (a) avoiding the transfer of the Fraudulently Conveyed Assets pursuant to New York State Debtor and Creditor Law §274, (b) setting aside the transfer of the Fraudulently Conveyed Assets, and (c) recovering from Central Station an amount to be determined at trial but in no event less than

RJA/849331.2/059814

$4,500,000 which is equal to any and all sums paid to or received by Central Station which amount is, in no event, less than $4,500,000 together with interest thereon.

## NINTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
(incorporating all prior allegations)

121.     NYMP did not receive fair consideration for the Fraudulently Conveyed Assets.

122.     Upon information and belief, at the time of the transfer of the Fraudulently Conveyed Assets, NYMP had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as they matured.

123.     The Fraudulently Conveyed Assets constitute fraudulent conveyances in violation of New York State Debtor and Creditor Law §275.

124.     By reason of the foregoing, the Receiver is entitled to a judgment (a) avoiding the transfer of the Fraudulently Conveyed Assets pursuant to New York State Debtor and Creditor Law §275, (b) setting aside the transfer of the Fraudulently Conveyed Assets, and (c) recovering from Central Station an amount to be determined at trial but in no event less than $4,500,000 which is equal to any and all sums paid to or received by Central Station which amount is, in no event, less than $4,500,000 together with interest thereon.

## TENTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
(incorporating all prior allegations)

125.     NYMP did not receive fair consideration for the Fraudulently Conveyed Assets.

126.     The transfer of the Fraudulently Conveyed Assets was made with the actual intent to hinder, delay, or defraud NYMP's creditors.

127.     By reason of the foregoing, the Receiver is entitled to a judgment (a) avoiding the transfer of the Fraudulently Conveyed Assets pursuant to New York State Debtor and Creditor Law §276, (b) setting aside the transfer of the Fraudulently Conveyed Assets, and (c) recovering from Central Station an amount to be determined at trial but in no event less than $4,500,000 which is equal to any and all sums paid to or received by Central Station which amount is, in no event, less than $4,500,000 together with interest thereon.

RJA/849331.2/059814

## ELEVENTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

128.   NYMP did not receive fair consideration for the Fraudulently Conveyed Assets.

129.   The transfer of the Fraudulently Conveyed Assets was made with the actual intent to hinder, delay, or defraud NYMP's creditors.

130.   By reason of the foregoing, pursuant to New York State Debtor and Creditor Law §276-a, the Receiver is entitled to recover any attorneys' fees incurred in connection with the commencement and litigation of the instant civil action.

## TWELFTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

131.   By its receipt of the Fraudulently Conveyed Assets, and by retaining the revenue received and generated using the Fraudulently Conveyed Assets, Central Station has been unjustly enriched.

132.   In equity and good conscience, Central Station should not be able to retain the benefit of the Fraudulently Conveyed Assets or any of the revenue received and generated using the Fraudulently Conveyed Assets, to NYMP's detriment.

133.   As a result of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000 together with prejudgment interest thereupon as permitted by law.

## THIRTEENTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

134.   As a result of the foregoing, Central Station is generating and has received revenue by using NYMP's Fraudulently Conveyed Assets, but has not rendered any payment to NYMP on account thereof.

135.   That revenue is in a constructive trust, and Central Station should therefore disgorge the revenue it has received from using NYMP's Fraudulently Conveyed Assets.

136.   The Receiver has no adequate remedy at law against Central Station.

21

RJA/849331.2/059814

## FOURTEENTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
### (incorporating all prior allegations)

137.    The Receiver has demanded that Central Station produce documentation to prove that it is the rightful owner and holder of the Fraudulently Conveyed Assets.

138.    Despite due demand, Central Station has produced no documentation to establish the foregoing.

139.    There is no valid enforceable contract between NYMP and Central Station so that Central Station would be the rightful owner and holder of the Fraudulently Conveyed Assets.

140.    Based upon the actions of all defendants, it would be futile for the Receiver to made due demand for return of the Fraudulently Conveyed Assets from Central Station to NYMP.

141.    Central Station has converted the Fraudulently Conveyed Assets given by NYMP without consideration, for its own use.

142.    By reason of the forgoing, NYMP has been damaged in an amount to be determined at trial but in no event less than $4,500,000.

## FIFTEENTH CLAIM FOR RELIEF AGAINST WAYNE WAHRSAGER
### (incorporating all prior allegations)

143.    Wayne Wahrsager, as a shareholder, officer, and director of NYMP had personal knowledge that NYMP had thousands of contracts with residential customers during the Prelitigation Period as well as since the commencement of the BofA Action and appointment of the Receiver.

144.    By sending the Cancelation Letter, Wayne Wahrsager, as a shareholder, officer, and director of NYMP, intentionally and improperly procured several of NYMP customers to breach the contract, to NYMP's detriment.

145.    Upon information and belief, Wayne Wahrsager continues to cause NYMP to send the Cancelation Letter to customers of NYMP.

RJA/849331.2/059814

146. Wayne Wahrsager's actions are in violation of the Order Appointing Receiver, and constitute continuing harm to NYMP.

147. By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### SIXTEENTH CLAIM FOR RELIEF AGAINST ERIC R. WAHRSAGER
(incorporating all prior allegations)

148. Eric R. Wahrsager, as an officer of NYMP had personal knowledge that NYMP had thousands of contracts with residential customers during the Prelitigation Period as well as since the commencement of the BofA Action and appointment of the Receiver.

149. By sending the Cancelation Letter, Eric R. Wahrsager, as an officer of NYMP, intentionally and improperly procured several of NYMP customers to breach the contract, to NYMP's detriment.

150. Eric R. Wahrsager, as a shareholder and officer of Central Station, has contacted customers of NYMP, in a blatant attempt to interfere with the known, and existing contractual relationships that NYMP has with its customers.

151. Eric R. Wahrsager's actions are in violation of the Order Appointing Receiver, and constitute continuing harm to NYMP.

152. By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### SEVENTEENTH CLAIM FOR RELIEF AGAINST AARON WAHRSAGER
(incorporating all prior allegations)

153. Aaron Wahrsager, as an officer of NYMP had personal knowledge that NYMP had thousands of contracts with residential customers during the Prelitigation Period as well as since the commencement of the BofA Action and appointment of the Receiver.

154. By sending the Cancelation Letter, Aaron Wahrsager, as an officer of NYMP intentionally and improperly procured several of NYMP's customers to breach the contract, to NYMP's detriment.

23

155.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### EIGHTEENTH CLAIM FOR RELIEF AGAINST WAYNE WAHRSAGER
(incorporating all prior allegations)

156.   Wayne Wahrsager's actions constitute tortious interference with the business relationships of NYMP.

157.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### NINETEENTH CLAIM FOR RELIEF AGAINST ERIC R. WAHRSAGER
(incorporating all prior allegations)

158.   Eric R. Wahrsager's actions constitute tortious interference with the business relationships of NYMP.

159.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### TWENTIETH CLAIM FOR RELIEF AGAINST AARON WAHRSAGER
(incorporating all prior allegations)

160.   Aaron Wahrsager's actions constitute tortious interference with the business relationships of NYMP.

161.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### TWENTY-FIRST CLAIM FOR RELIEF AGAINST WAYNE WAHRSAGER
(incorporating all prior allegations)

162.   Among other things, for NYMP, the residential customer list, rates charged to those customers, and history of responses to those customers are trade secrets.

163.   By causing NYMP to transfer the Fraudulently Conveyed Assets to Central Station, Wayne Wahrsager has breached a confidential duty he owed to NYMP, and has misappropriated the trade secrets of NYMP.

RJA/849331.2/059814

164.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### TWENTY-SECOND CLAIM FOR RELIEF AGAINST ERIC R. WAHRSAGER
(incorporating all prior allegations)

165.   Among other things, for NYMP, the residential customer list, rates charged to those customers, and history of responses to those customers are trade secrets.

166.   By causing NYMP to transfer the Fraudulently Conveyed Assets to Central Station, Eric R. Wahrsager has breached a confidential duty he owed to NYMP, and has misappropriated the trade secrets of NYMP.

167.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### TWENTY-THIRD CLAIM FOR RELIEF AGAINST AARON WAHRSAGER
(incorporating all prior allegations)

168.   Among other things, for NYMP, the residential customer list, rates charged to those customers, and history of responses to those customers are trade secrets.

169.   By causing NYMP to transfer the Fraudulently Conveyed Assets to Central Station, Aaron Wahrsager has breached a confidential duty he owed to NYMP, and has misappropriated the trade secrets of NYMP.

170.   By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

### TWENTY-FOURTH CLAIM FOR RELIEF AGAINST CENTRAL STATION
(incorporating all prior allegations)

171.   Because Wayne Wahrsager, Mark Fisher, Eric R. Wahrsager, and Aaron Wahrsager misappropriated NYMP's trade secrets, Central Station has been able to unfairly compete against NYMP.

RJA/849331.2/059814

172.     Central Station, through the actions of Wayne Wahrsager, Mark Fisher, Eric R. Wahrsager, and Aaron Wahrsager has been and is continuing to unfairly compete with NYMP because it has knowledge of NYMP's customer list.

173.     By reason of the foregoing, NYMP has been damaged in an amount to be determined at trial, but in no event less than $4,500,000.

## TWWENTY-FIFTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(incorporating all prior allegations)

174.     If the defendants are permitted to continue to engage in the sabotage as set forth *supra*, NYMP will suffer irreparable harm.

175.     The Receiver and NYMP have no adequate remedy at law.

176.     By reason of the foregoing, the Receiver and NYMP are entitled to a judgment and order permanently enjoining and restraining Defendants, their attorneys, employees, representatives, affiliates, subsidiaries, successors, assigns, and all those acting in concert with them from taking any affirmative actions (including, but not limited to, using NYMP's confidential customer list to steal or solicit existing customers of NYMP, shredding documents, or wiping computer hard drives) or from refraining to take such necessary actions (such as providing routine and customary maintenance and servicing of customer accounts), that would in any manner harm or injure the going concern value and the business operations Central Station or NYMP

## TWENTY-SIXTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
(incorporating all prior allegations)

177.     The Fraudulently Conveyed Assets are subject to Bank of America's first priority security interest.

178.     Upon information and belief, Central Station disputes that Bank of America has a first priority security interest in the Fraudulently Conveyed Assets.

26

179.    An actual and justiciable controversy exists between the Receiver and Central Station and a judicial declaration is necessary and appropriate at this time in order to determine the respective rights and obligations of the parties to the Fraudulently Conveyed Assets.

180.    The Receiver is entitled to a judicial determination pursuant to 28 U.S.C. §2201 that (a) the Fraudulently Conveyed Assets and the proceeds thereof are subject to Bank of America's first priority security interest.

**WHEREFORE**, it is respectfully requested that the Court enter judgment in favor of the Receiver as follows:

(a)    on the first claim for relief against Wayne Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(b)    on the second claim for relief against Wayne Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(c)    on the third claim for relief against Eric R. Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(d)    on the fourth claim for relief against Eric R. Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(e)    on the fifth claim for relief against Aaron Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(f)    on the sixth claim for relief against Aaron Wahrsager in an amount to be determined at trial, but in no event less than $4,500,000;

(g)    on the seventh claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(h)    on the eighth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(i)    on the ninth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

27

(j)     on the tenth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(k)     on the eleventh claim for relief against Central Station in an amount to be determined at trial;

(l)     on the twelfth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(m)     on the thirteenth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(n)     on the fourteenth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(o)     on the fifteenth claim for relief against Wayne Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(p)     on the sixteenth claim for relief against Eric R. Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(q)     on the seventeenth claim for relief against Aaron Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(r)     on the eighteenth claim for relief against Wayne Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(s)     on the nineteenth claim for relief against Eric R. Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(t)     on the twentieth claim for relief against Aaron Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(u)     on the twenty-first claim for relief against Wayne Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(v)     on the twenty-second claim for relief against Eric R. Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

28

(w)     on the twenty-third claim for relief against Aaron Wahrsager in an amount to be determined at trial but in no event less than $4,500,000;

(x)     on the twenty-fourth claim for relief against Central Station in an amount to be determined at trial but in no event less than $4,500,000;

(y)     on the twenty-fifth claim for relief granting the Receiver a permanent injunction enjoining and restraining Defendants, their attorneys, employees, representatives, affiliates, subsidiaries, successors, assigns, and all those acting in concert with them from taking any affirmative actions (including, but not limited to, using NYMP's confidential customer list to steal or solicit existing customers of NYMP, shredding documents, or wiping computer hard drives) or from refraining to take such necessary actions (such as providing routine and customary maintenance and servicing of customer accounts), that would in any manner harm or injure the going concern value and the business operations of Central Station or NYMP;

(z)     on the twenty-sixth claim for relief against all defendants granting the Receiver a determination that the Fraudulently Conveyed Assets and the proceeds thereof are subject to Bank of America's first priority security interest;

(aa)    costs and disbursements of the action; and

(bb)    such other and further relief as the Court deems just and proper.

Dated: Jericho, New York
      February 18, 2011

                                            SILVERMAN ACAMPORA LLP
                                            Attorneys for Ronald J. Friedman,
                                            Esq., Receiver


                                            By: Robert J. Ansell
                                            100 Jericho Quadrangle
                                            Suite 300
                                            Jericho, New York 11753
                                            (516) 479-6300
                                            ransell@silvermanacampora.com

29

**EXHIBIT 1**

BEFORE: DENIS R. HURLEY, U.S. DISTRICT JUDGE

DATE: JANUARY 5, 2011        TIME: 2:15- 4:30 PM

CIVIL CAUSE FOR: CIVIL ORDER TO SHOW CAUSE HEARING
CASE NUMBER:    CV-11-0038

TITLE:  BANK OF AMERICA   V.   NEW YORK MERCHANTS PROTECTIVE CO, et
al.


APPEARANCES: FOR PLAINTIFF: JEAN MARIE ATAMIAN, ESQ.
             FOR DEFENDANT: JEFFREY WURST, ESQ

             COURT REPORTER: DOM TURSI

  X   CASE CALLED FOR ORDER TO SHOW CAUSE HEARING.

     THE  COURT GRANTS PLAINTIFF'S APPLICATION TO APPOINT RONALD
FRIEDMAN AS RECEIVER.   THIS ORDER SHALL BE EFFECTIVE IMMEDIATELY.

     PLAINTIFF IS DIRECTED TO SUBMIT AN ORDER CONSISTENT WITH THE
COURT'S RULINGS.   A BOND IN THE AMOUNT OF $50,000.00 SHALL BE POSTED
WITH THE CLERK OF THE COURT BY 12:00 PM ON FRIDAY, JANUARY 7, 2011.

     AN INJUNCTION HEARING WILL BE HELD ON TUESDAY, JANUARY 18, 2011 AT
9:30 AM.

# FIDELITY AND DEPOSIT COMPANY OF MARYLAND
### Home Office: Baltimore, Maryland 21211

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Bond No. CFB 9029844

-------------------------------------------------------X

BANK OF AMERICA ,

RECEIVER'S BOND
CASE NO. CV -11-0038

Plaintiff

- against -

NEW YORK MERCHANTS PROTECTIVE CO, et

Defendant

-------------------------------------------------------X

KNOW ALL MEN BY THESE PRESENTS, That we, Ronald Friedman  at  100 Jericho Quadrangle, Suite 300, Jericho, NY 11753, and the FIDELITY & DEPOSIT COMPANY OF MARYLAND, having an office and place of business at One Liberty Plaza, 165 Broadway,  New York, NY 10006, as Surety, are held and firmly bound unto THE UNITED STATES OF AMERICA, in the sum of FIFTY THOUSAND 00/100THS-($50,000.00)DOLLARS, lawful money of the United States, to be paid to THE UNITED STATES OF AMERICA, for which payment, well and truly to be made, the said  Ronald Friedman, binds himself, his heirs, executors and administrators, and the said Company binds itself, its successors and assigns, jointly and severally, firmly by these presents.

Sealed with our seals, and dated the 6th day of January, 2011.

WHEREAS, by an order to show dated on the 5th day of January, 2011, by the Honorable Denis R. Hurley of the above-entitled Court, the above named  Ronald Friedman was duly appointed Receiver in the above entitled action.

NOW, The CONDITION OF THIS OBLIGATION IS SUCH, That, if the said Ronald Friedman, shall faithfully discharge the duties of his trust, and shall duly account for all moneys received by him as such Receiver, then this obligation shall be void, otherwise to be in full force and effect.

By: ████████████████
Ronald Friedman                          Principal

FIDELITY & DEPOSIT COMPANY OF MARYLAND

By: ████████████████
Margaret McLaughlin                    Attorney-In-Fact

STATE OF     NEW YORK

COUNTY OF     NEW YORK

I, Margaret McLaughlin, Attorney-in-Fact of the Fidelity and Deposit Company of Maryland, have compared the foregoing Resolution with the original thereof as recorded in the Minute Book of said Company, and do certify that the same is a true and correct transcript therefrom and of the whole of said original Resolution, and that the said Resolution is still in full force and effect.

Given under my hand and the seal of the Company, at the City of New York, this the 6th day of January, 2011.

Margaret McLaughlin      Attorney-in-Fact

STATE OF NEW YORK

COUNTY OF NEW YORK

On the 6th of January, 2011, before me personally came Margaret McLaughlin to me known, who, being duly sworn, did depose and say that she resides at 60 East 42nd Street, New York, New York, State of New York, that she is Attorney-In-Fact of Fidelity and Deposit Company of Maryland, the corporation described in and which executed the within instrument; that she knows the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that is was so affixed by the Board of Directors of said corporation, and that she signed her name thereto by like order; and that the Fidelity and Deposit Company of Maryland is duly authorized to transact business in the State of New York in pursuance of the statues in such case made and provided; that the Superintendent of Insurance of the State of New York, has, pursuant to Chapter 28 of the Consolidated Laws of the State of New York, known as the Insurance Law, issued to the Fidelity and Deposit Company of Maryland a Certificate of Solvency and of Qualification to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law; and that such certificate has not been revoked.

ANITA HUNTER
Notary Public, State of New York
NO. 01HU4828371
Qualified in Richmond County
Commission Expires April 30, 20__

Notary Public

---

STATE OF

COUNTY OF

On this 7th day of January 2011 before me personally appeared the within name Ronald Friedman to me known, and know to me Ronald Friedman the individual described in and who executed the within bond and he/she acknowledged to me that he/she executed the same.

Lynne M. Manzolillo
Notary Public, State of NY
No. 01MA6204014
Qualified in Suffolk County
Commission Expires April 13, 2013

Notary Public

### Power of Attorney
### FIDELITY AND DEPOSIT COMPANY OF MARYLAND
### COLONIAL AMERICAN CASUALTY AND SURETY COMPANY

KNOW ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, corporations of the State of Maryland, by THEODORE G. MARTINEZ, Vice President, and ERIC D. BARNES, Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Companies, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, does hereby nominate, constitute and appoint Sybil LEVINE, Maria SPONZA, Anita HUNTER, Margaret MCLAUGHLIN and Carol DELINE, all of New York, New York, EACH its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed: any and all bonds and undertakings, and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Companies, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons. This Power of Attorney revokes that issued on behalf of Maria SPONZA, Anita HUNTER, Carol LEVINE, Sybil LEVINE, Margaret MCLAUGHLIN, dated August 5, 2004.

The said Assistant Secretary does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article VI, Section 2, of the By-Laws of said Companies, and is now in force.

IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seals of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, this 26th day of August, A.D. 2004.

ATTEST:
                                        FIDELITY AND DEPOSIT COMPANY OF MARYLAND
                                        COLONIAL AMERICAN CASUALTY AND SURETY COMPANY



    *Eric D. Barnes     Assistant Secretary*          By: *Theodore G. Martinez*

State of Maryland  } ss:
Baltimore County   }

On this 26th day of August, A.D. 2004, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came THEODORE G. MARTINEZ, Vice President, and ERIC D. BARNES, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Companies aforesaid, and that the seals affixed to the preceding instrument is the Corporate Seals of said Companies, and that the said Corporate Seals and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporations.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

                                        *Dennis R. Hayden*              Notary Public
                                        My Commission Expires:  February 15, 2013

POA-F 093-5456

## EXTRACT FROM BY-LAWS OF FIDELITY AND DEPOSIT COMPANY OF MARYLAND

"Article VI, Section 2. The Chairman of the Board, or the President, or any Executive Vice-President, or any of the Senior Vice-Presidents or Vice-Presidents specially authorized so to do by the Board of Directors or by the Executive Committee, shall have power, by and with the concurrence of the Secretary or any one of the Assistant Secretaries, to appoint Resident Vice-Presidents, Assistant Vice-Presidents and Attorneys-in-Fact as the business of the Company may require, or to authorize any person or persons to execute on behalf of the Company any bonds, undertaking, recognizances, stipulations, policies, contracts, agreements, deeds, and releases and assignments of judgements, decrees, mortgages and instruments in the nature of mortgages,...and to affix the seal of the Company thereto."

## EXTRACT FROM BY-LAWS OF COLONIAL AMERICAN CASUALTY AND SURETY COMPANY

"Article VI, Section 2. The Chairman of the Board, or the President, or any Executive Vice-President, or any of the Senior Vice-Presidents or Vice-Presidents specially authorized so to do by the Board of Directors or by the Executive Committee, shall have power, by and with the concurrence of the Secretary or any one of the Assistant Secretaries, to appoint Resident Vice-Presidents, Assistant Vice-Presidents and Attorneys-in-Fact as the business of the Company may require, or to authorize any person or persons to execute on behalf of the Company any bonds, undertaking, recognizances, stipulations, policies, contracts, agreements, deeds, and releases and assignments of judgements, decrees, mortgages and instruments in the nature of mortgages,...and to affix the seal of the Company thereto."

## CERTIFICATE

I, the undersigned, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY, do hereby certify that the foregoing Power of Attorney is still in full force and effect on the date of this certificate; and I do further certify that the Vice-President who executed the said Power of Attorney was one of the additional Vice-Presidents specially authorized by the Board of Directors to appoint any Attorney-in-Fact as provided in Article VI, Section 2, of the respective By-Laws of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY.

This Power of Attorney and Certificate may be signed by facsimile under and by authority of the following resolution of the Board of Directors of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND at a meeting duly called and held on the 10th day of May, 1990 and of the Board of Directors of the COLONIAL AMERICAN CASUALTY AND SURETY COMPANY at a meeting duly called and held on the 5th day of May, 1994.

RESOLVED: "That the facsimile or mechanically reproduced seal of the company and facsimile or mechanically reproduced signature of any Vice-President, Secretary, or Assistant Secretary of the Company, whether made heretofore or hereafter, wherever appearing upon a certified copy of any power of attorney issued by the Company, shall be valid and binding upon the Company with the same force and effect as though manually affixed."

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seals of the said Companies,

this ___6th___ day of ___January___, ___2011___.

*C W Roberts*

*Assistant Secretary*

# FIDELITY AND DEPOSIT COMPANY
## OF MARYLAND
### 3910 KESWICK ROAD,  BALTIMORE, MD 21211-2226

Statement of Financial Condition
As Of December 31, 2009

### ASSETS

| | | |
|---|---|---:|
| Bonds | $ | 156,584,995 |
| Stocks | | 22,537,672 |
| Cash and Short Term Investments | | 9,719,598 |
| Reinsurance Recoverable | | 9,347,241 |
| Other Accounts Receivable | | 51,052,264 |
| TOTAL ADMITTED ASSETS | $ | 249,241,769 |

### LIABILITIES, SURPLUS AND OTHER FUNDS

| | | | |
|---|---|---|---:|
| Reserve for Taxes and Expenses | | $ | 76,835 |
| Ceded Reinsurance Premiums Payable | | | 58,237,612 |
| Securities Lending Collateral Liability | | | 5,511,875 |
| TOTAL LIABILITIES | | $ | 63,826,322 |
| Capital Stock, Paid Up | $ 5,000,000 | | |
| Surplus | 180,415,448 | | |
| Surplus as regards Policyholders | | | 185,415,447 |
| TOTAL | | $ | 249,241,769 |

Securities carried at $38,385,957 in the above statement are deposited as required by law.

Securities carried on the basis prescribed by the National Association of Insurance Commissioners.  On the basis of December 31, 2009 market quotations for all bonds and stocks owned, the Company's total admitted assets would be $247,657,513 and surplus as regards policyholders $186,999,703.

I, DENNIS F. KERRIGAN, Corporate Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, do hereby certify that the foregoing statement is a correct exhibit of the assets and liabilities of the said Company on the 31st day of December, 2009.



*Corporate Secretary*

State of Illinois
City of Schaumburg  } SS:

Subscribed and sworn to, before me, a Notary Public of the State of Illinois, in the City of Schaumburg, this 15th day of March, 2010.



MARLO G. SARABYN
MY COMMISSION EXPIRES
NOVEMBER 25, 2011

*Notary Public*

# STATE OF NEW YORK
## INSURANCE DEPARTMENT

### CERTIFICATE OF SOLVENCY UNDER SECTION 1111 OF THE NEW YORK INSURANCE LAW

It is hereby certified that

### Fidelity and Deposit Company of Maryland
### of Baltimore, Maryland

a corporation organized under the laws of the State of Maryland and duly authorized to transact the business of insurance in this State, is qualified to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law; and that the said corporation is possessed of a capital and surplus including gross paid-in and contributed surplus and unassigned funds (surplus) aggregating the sum of $178,625,738.(Capital $5,000,000.) as is shown by its sworn financial statement for the year ended December 31, 2008, on file in this Department, prior to audit.

The said corporation cannot lawfully expose itself to loss on any one risk or hazard to an amount exceeding 10% of its surplus to policyholders, unless it shall be protected in excess of that amount in the manner provided in Section 4118 of the Insurance Law of this State.



In Witness Whereof, I have here-unto set my hand and affixed the official seal of this Department at the City of Albany, this 2nd day of July, 2009.

Eric R. Dinallo
Superintendent of Insurance

By *Clark J. Williams*

Clark J. Williams
Special Deputy Superintendent

Case 2:11-cv-00815-DRH-ARL   Document 1   Filed 02/18/11   Page 38 of 67 PageID #: 38

| 01/19/2011 | 11 | MOTION to Appoint Receiver / *Proposed Order Appointing Receiver* by Ronald J. Friedman. (Friedman, Ronald) (Entered: 01/19/2011) |
| 01/19/2011 | | ENDORSED ORDER granting 11 Motion to Appoint Receiver. The parties' January 19, 2011 Order Appointing Receiver is hereby "So Ordered." Ordered by Senior Judge Denis R. Hurley on 1/19/2011. (Monaco, Laura) (Entered: 01/19/2011) |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BANK OF AMERICA, N.A., individually and
as a successor to LaSalle Bank, National
Association, a national banking association,

                         Plaintiff,

    -against-

NEW YORK MERCHANTS PROTECTIVE
CO., INC., a New York Corporation, NEW YORK
MERCHANTS ALARM RESPONSE INC., a
Delaware Corporation, and NY MERCH PROT
CO., INC., a Delaware Corporation,

                         Defendants.
------------------------------------------------------------X

**ORDER**

11 CV 38  (DRH) (ARL)

**APPEARANCES:**

**MAYER BROWN LLP**
Attorneys for Plaintiff
1674 Broadway
New York, New York 11019
By:    Jean Marie Lucien Atamian, Esq.

**RUSKIN, MOSCOU, FALTISCHEK, P.C.**
Attorneys for Defendants
1425 Reckson Plaza
East Tower, 15th Floor
Uniondale, New York 11556
By:    Jeffrey A. Wurst

**HURLEY, Senior District Judge:**

      On January 5, 2011, plaintiff Bank of America, N.A. ("Plaintiff") commenced this action

by filing a Complaint asserting claims against defendants New York Merchants Protective Co.,

Inc., New York Merchants Alarm Response, Inc., and NY Merch Prot Co., Inc. (collectively,

"Defendants") for breach of a loan agreement, collection under guaranty, and breach of guaranty.

The Complaint also seeks temporary and permanent equitable relief in the form of the

appointment of a Receiver "to take possession, manage and control the business" of Defendants.
(Compl, WHEREFORE (b).)

On the same date, Plaintiff filed an unsigned Order to Show Cause, along with accompanying declarations, seeking the immediate appointment of a "temporary receiver" with the power to, *inter alia*, "(a) take exclusive possession, custody and control of all Defendants' books and records and assets, wherever located; (b) exclusively operate and manage Defendants' businesses until disposition thereof or until further order of Court; and (c) pursue such further and other relief as may be proper, necessary or just under the circumstances." (Unsigned Order to Show Cause, dated January 5, 2011, at 2.)

The parties appeared before the Court on January 5, 2011 for a hearing on Plaintiff's emergency application. Additionally, a plenary hearing was scheduled for January 18, 2011 at 9:30 a.m. to more fully address the relief sought in the unsigned Order to Show Cause. The Court made numerous rulings on the record on January 5, 2011 and directed Plaintiff to submit a proposed order incorporating those rulings. Plaintiff submitted a proposed order under cover of a letter dated January 10, 2011. (Docket No. 8.) By letter of the same date, Defendants submitted objections to Plaintiff's proposed order as well as their own version of the proposed order. (Docket No. 7.) Having considered the parties' written submission and after a review of the transcript from the January 5, 2011 proceedings, IT IS HEREBY ORDERED:

(1)   Ronald J. Friedman, Esq., Silverman Acampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York, is appointed to serve as a receiver (the "Receiver") for Defendants New York Merchants Protective Co., Inc., New York Merchants Alarm Response, Inc., and New York Merc Prot Co., Inc.

2

(2)     The Receiver's appointment and the other provisions of this Order are effective as of January 5, 2011 consistent with the oral orders entered on the record on that date and shall remain effective until the latter of January 18, 2011 or the date of the show cause hearing (the "period of the Receivership");

(3)     The Receiver shall have the power and the responsibility to monitor and control all monies that are received by Defendants as well as all monies that are owed to Defendants during the period of the Receivership;

(4)     The Receiver shall oversee, directly or indirectly, the disbursements by Defendants of any funds under the control of any of the defendant corporations during the period of the Receivership;

(5)     The Receiver shall not take over the control over the management of the defendant corporations. The present management may continue in their current capacities during the period of the Receivership;

(6)     The Receiver shall make all reasonable efforts to prevent any dissipation of the Defendants' asserts during the period of the Receivership;

(7)     The Receiver shall make all reasonable efforts to prevent any documents presently on site or under the control of any one or more of the defendant corporations from being destroyed during the period of the Receivership; and

(8)     The Receiver shall have the right to engage the services of professionals to assist him in performing his role. The Receiver shall act reasonably in this regard. The Receiver may engage the forensic accounting services of Mr. Brady.

IT IS FURTHER ORDERED, that Defendants are directed:

3

(1)     Not to take engage in any action or inaction that would result in the dissipation of any of the Defendants' assets during the period of the Receivership; and

(2)     Not to destroy any documents or records without a prior Court order until this matter is adjudicated.

IT IS FURTHER ORDERED, that the Receiver's reasonable fees during the period of the Receivership will be charged to Defendants; and

IT IS FURTHER ORDERED, that the Receiver post a bond in the amount of $50,000 by 12:00 p.m. on January 7, 2011.

Finally, it is noted that by letter dated January 14, 2011, Defendants informed the Court that Defendants consented to the appointment of a receiver without any admission of wrongdoing.  (Docket No. 10.)  Based on that representation, the January 18, 2011 hearing was cancelled.  (Jan. 14, 2011 Elec. Order.)  On January 19, 2011, at the Court's direction, the parties submitted a proposed Order Appointing Receiver (docket no. 11), which the Court endorsed by Electronic Order of the same date.

SO ORDERED.

Dated: Central Islip, New York
       January 19, 2011

                                            _____/s/_____
                                            Denis R. Hurley
                                            Unites States District Judge

MAYER BROWN LLP
Jean-Marie Atamian
Frederick D. Hyman
1675 Broadway
New York, New York  10019
Tel: (212) 506-2500
Attorneys for Plaintiff

MAYER BROWN LLP
Thomas S. Kiriakos
Beverley J. Klein
Michael W. Ott
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------x

|  |  |
|---|---|
| BANK OF AMERICA, N.A., individually and as successor to LaSalle Bank, National Association, a national banking association, <br><br> Plaintiff, <br><br> v. <br><br> NEW YORK MERCHANTS PROTECTIVE CO., INC., a New York corporation; NEW YORK MERCHANTS ALARM RESPONSE INC., a Delaware corporation; and NY MERCH PROT CO., INC., a Delaware corporation, <br><br> Defendants. | Case No.  11-cv-00038 |

---------------------------------------------------x

## ORDER APPOINTING RECEIVER

Upon the Summons and Complaint filed by Plaintiff on January 5, 2011, the Declaration of Barbara Rajchel sworn to on December 29, 2010, the Declaration of Jean-Marie Atamian sworn to on January 3, 2011, Plaintiff's Memorandum of Law In Support of Its Emergency

Application For Appointment of A Receiver, the record of the hearing held on January 5, 2011, pursuant to which a receiver was appointed for Defendants on an interim basis, and a bond of $50,000 having been posted by the Receiver on January 7, 2011, and Plaintiff and Defendants having consented to the appointment of a receiver without any admission of any allegations made by the Plaintiff and upon the terms described herein, and good cause having been shown,

**IT IS HEREBY ORDERED** that:

1.      Ronald J. Friedman, Esq., c/o SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York, is hereby appointed to serve as the receiver (the "Receiver") for Defendants New York Merchants Protective Co., Inc., New York Merchants Alarm Response, Inc., and New York Merc Prot Co., Inc. ("Defendants").

2.      The Receiver's appointment is effective *nunc pro tunc* to January 5, 2011.

3.      The Receiver shall have and retain and is hereby granted exclusive dominion and control over all of the assets, finances, books and records, operations and business affairs of Defendants until such assets are sold or otherwise disposed of by the Receiver.

4.      Defendants shall turn over to the Receiver all books and records in whatever format same exist.  Defendants acknowledge that certain of their electronic/computer records are shared on a computer system with Nationwide Digital Monitoring Co. ("Nationwide"), not a party to this action, and the Receiver and anyone acting on his behalf agrees not to intentionally access, read, analyze or review any of Nationwide's data, without further order of the Court.

5.      The Receiver's authority hereunder shall be, and hereby is, vested in and extended to (a) all of Defendants' real property, equitable property, tangible and intangible personal property, interests, or assets of any nature, wherever located and (b) all claims, demands, or causes of action of any kind, character or description, regardless of the legal principle or theory

2

upon which the same may be based, whether known or unknown, liquidated or unliquidated, disputed or undisputed, contingent or absolute, accrued or unaccrued, matured or unmatured, insured or uninsured, joint or several, determined or undetermined, determinable or otherwise.

6.    The Receiver is hereby authorized to operate and manage Defendants' businesses until sold or until further order of the Court.

7.    The Receiver is hereby authorized in his discretion to remove Defendants' current management (including, but not limited to, Wayne M. Wahrsager, Mark Fischer and Bert Wasserman) from their management and/or other employment positions with Defendants and, in the Receiver's sole discretion, to retain or remove any other employee, manager or agent of Defendants from his or her positions.

8.    The Receiver is hereby authorized to take possession of and, in his discretion, close Defendants' existing deposit accounts, open new accounts in the Receiver's name, and access and use any and all of Defendants' cash, accounts and other assets in the ordinary course of business.

9.    The Receiver is hereby authorized to communicate with parties having existing contracts and subcontracts with Defendants, to negotiate and enter into new contracts, and to extend, renew, renegotiate and/or terminate existing contracts as part of the Receiver's operation of Defendants' businesses.

10.    The Receiver is hereby authorized to investigate any of the Defendants' assets, business affairs, and operations and can pursue appropriate remedies.  The Receiver's authorization to seek such remedies is independent of any of Plaintiff's remedies, all of which are expressly reserved.

3

11.    The Receiver is authorized to conduct Defendants' business and take all action Defendants could take on their own behalf, including, but not limited to, all actions the Receiver in his sole discretion, deems appropriate in order to collect or otherwise resolve past due accounts receivable and recover any and all customer accounts.

12.    The Receiver is hereby authorized to market and sell, with Plaintiff's written consent, free and clear of Plaintiff's lien, any and all of Defendants' property that is pledged as security or collateral for the indebtedness owing to Plaintiff, including engaging investment banking services and entering into contracts for that purpose.   Following any sale of the Defendants' property, the Receiver is authorized to pay over proceeds from such sale to Plaintiff without further order of the Court.

13.    The Receiver is hereby authorized to retain, employ and pay for the services of individuals or firms selected by the Receiver in his discretion to assist in the performance of the Receiver's duties, including, without limitation, individuals qualified to manage the businesses on a day-to-day basis and attorneys, as may be needed from time to time.  It shall not be grounds for an attorney's disqualification that the attorney is a partner or associate or otherwise affiliated with the Receiver's law firm.

14.    The Receiver is hereby authorized to access Protective Advances that Plaintiff, as secured creditor, may in its sole discretion make available to Receiver in order to protect and preserve its collateral, and such Protective Advances shall be added to the Indebtedness under the terms of the governing Loan and Security Agreement among New York Merchants Protective Co., Inc., and certain of its subsidiaries and La Salle Bank, National Association, dated January 31, 2006 ("Loan Agreement").

15.     The Receiver is vested with the power and authority to pay, in his discretion, the reasonable and necessary expenses of operating the Defendants' business, including, but not limited to the payment of wages, employee benefits, utilities, rent, service fees, monitoring charges to any third-party monitoring company and such other expenses as the Receiver determines need to be paid.

16.     The Receiver is authorized to turn over to Plaintiff any excess available cash from operations for application against the Indebtedness, as allowed by the terms of the Loan Agreement.

17.     The Receiver shall have the duties and responsibilities of a receiver under New York law, shall be answerable and account to the Court for the Receiver's activities, and shall maintain a detailed accounting of his activities, including without limitation, any and all funds collected and used for any purpose. The Receiver is hereby authorized to do such things, execute such documents and expend such funds as are necessary to implement the terms and conditions of this Order.

18.     The Receiver shall not be liable for any debts or liabilities of Defendants incurred prior to or after his appointment as receiver.

**IT IS FURTHER ORDERED** that Defendants, and their professional representatives, and employees, shall immediately turn over Defendants' businesses and all assets to the Receiver, together with all contracts, subcontracts, and other documents, records, files and other materials relating thereto, and it is further

**ORDERED**, that Defendants, its employees and professional representatives shall fully cooperate with and respond to all reasonable requests of the Receiver, and it is further

5

**ORDERED**, that the Defendants, its employees and professional representatives shall not:

1. Communicate with individuals or entities with whom Defendants have contracts or subcontracts except as specifically authorized by the Receiver;

2. Collect, withdraw or transfer, in any way, funds or revenue derived from the operation of Defendants' businesses;

3. Remove from the Premises or destroy any property belonging to Defendants whether at the Premises or otherwise;

4. Transfer, convey, sell, dispose of or encumber any property directly or indirectly belonging to Defendants;

5. Terminate or cause to be terminated any license, permit, lease, contract, or insurance policy;

6. Intentionally dissipate Defendants' assets;

7. Destroy any documents; and it is further

**ORDERED**, that Wayne Wahrsager shall continue to be Defendants' license qualifier as long as his employment with the Defendants continues; and it is further

**ORDERED**, that the Receiver's bond in the sum of $50,000 posted on January 7, 2011 shall continue until further order of the Court; and it is further

6

**ORDERED**, that the Receiver, following submission of a monthly invoice to Plaintiff,

shall be authorized to pay the Receiver's invoice within five (5) days after the expiration of the

notice period provided in the monthly invoice or as otherwise agreed by and between the

Receiver and Plaintiff.

Dated:   January __, 2011

    Central Islip, New York


_____
The Honorable Denis R. Hurley
UNITED STATES DISTRICT JUDGE


CONSENTED TO:

By:   _s/Jean-Marie L. Atamian_____
Mayer Brown LLP
1675 Broadway
New York, New York 10019
Authorized Attorneys for Plaintiff


By:   _s/Jeffrey A. Wurst_____
Ruskin Moscou Faltischek, P.C.
1425 RXR Plaza
Uniondale, New York 11556
Authorized Attorneys for Defendants

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT
### for the Eastern District of New York

BANK OF AMERICA, N.A., individually and
as successor to LaSalle National Bank,
National Association, a national banking
association,

Plaintiff,

Case No.  11-cv-00038

v.

NEW YORK MERCHANTS PROTECTIVE
CO., INC., a New York corporation; NEW
YORK MERCHANTS ALARM RESPONSE
INC., a Delaware corporation; and
NY MERCHANT PROT CO., INC., a
Delaware corporation,

Defendant.

## APPEARANCE OF COUNSEL

To:     The clerk of court and all parties of record

    I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for Ronald J. Friedman, Esq., the Court Appointed Receiver of Defendant, New York Merchants Protective Co., Inc. and hereby enters its appearance and requests copies of all notices and pleadings.

Date: January 20, 2011

**Silverman Acampora LLP**
Attorneys for Ronald J. Friedman, Esq.,
Court Appointed Receiver of New York
Merchants Protective Co., Inc.

By:   _s/Ronald J. Friedman_
Ronald J. Friedman
A Member of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York  11753
Telephone Phone:  (516) 479-6300
Email: RFriedman@SilvermanAcampora.com

RJF/843894/V1/059814

**EXHIBIT 2**

**CV 11 0038**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 0 5 2011 ★

LONG ISLAND OFFICE

----------------------------------------------------------x

BANK OF AMERICA, N.A.,
individually and as successor to LaSalle Bank,
National Association, a national banking association,

Plaintiff,

v.

NEW YORK MERCHANTS PROTECTIVE CO.,
INC., a New York Corporation; NEW YORK
MERCHANTS ALARM RESPONSE INC., a
Delaware Corporation; and NY MERCH PROT
CO., INC., a Delaware Corporation,

Defendants.

----------------------------------------------------------x

Case No.

**HURLEY, J.
LINDSAY, M.**

## COMPLAINT

Plaintiff Bank of America, N.A. ("Plaintiff"), individually and as successor by merger to LaSalle Bank, National Association ("LaSalle Bank"), by and through its undersigned attorneys, for its Complaint against defendants New York Merchants Protective Co., Inc. (the "Borrower"), New York Merchants Alarm Response Inc. ("NY Alarm Response"), and NY Merch Prot Co., Inc. ("NY Merch Prot," and together with NY Alarm, the "Affiliate Guarantors," and each individually an "Affiliate Guarantor"; the Affiliate Guarantors, together with the Borrower, the "Defendants," and each individually a "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.     This Complaint is brought against Defendants: (a) to collect amounts owing under a promissory note and loan agreement to Plaintiff by the Borrower, a New York corporation controlled by Mark Fischer ("Fischer") and Wayne M. Wahrsager ("Wahrsager") (collectively, the "Principals"); (b) to collect amounts owing from the Affiliate Guarantors under their absolute

and unconditional guaranties of Borrower's obligations to Plaintiff, and (c) to obtain the appointment of a Receiver to take possession, control, manage and operate Defendants' businesses as a result of the Principals' fraudulent, harmful and uncooperative conduct, as more fully set forth below.

2.    Defendants are in the business of providing central station monitoring and/or similar services for security alarm and/or similar equipment or devices to residential and commercial customers on both a retail and wholesale basis. They share management, employees and technology, as well as office space in Freeport, New York. Wahrsager and Fischer are the principals of and control each of the companies.

3.    As detailed more fully below, the Borrower has defaulted on its monetary and other obligations to Plaintiff under the applicable loan documents. Plaintiff is presently owed approximately $19,282,130.64, exclusive of interest, attorneys' fees and expenses, in connection with a $17,500,000.00 revolving loan made by Plaintiff to the Borrower and an overdraft in an amount not greater than $1,541,596.96 resulting from a check-kiting scheme perpetrated by Borrower and one or both of the Principals. Pursuant to the express terms of the governing loan agreement, the Affiliate Guarantors and the Borrower are each "Obligors" and their assets are pledged as security for the Borrower's obligations. Pursuant to their respective Affiliate Guaranties, defined below, each of the Affiliate Guarantors also is liable to Plaintiff for the full amount of the Borrower's obligations.

4.    The Borrower, under the active direction of Wahrsager, perpetrated a fraudulent check-kiting scheme in Freeport, New York, in order to artificially inflate the balance of the Borrower's deposit accounts with Plaintiff and create an artificial source of funding. After Plaintiff discovered the check-kiting scheme, subsequent reconciliation of the Borrower's

2

deposit account showed that more than one hundred kited checks exceeding $30 million had been deposited into the Borrower's accounts, and the scheme resulted in an overdraft exceeding $1.44 million. Despite Wahrsager's admission that he engaged in this fraudulent conduct and Fischer's subsequent representation that Wahrsager would be removed from control of the Defendants' operations, Wahrsager nevertheless remains in day to day control of the Defendants.

5. Further, in order to hide losses that the Borrower had begun to incur as its business declined, the Borrower made false representations to Plaintiff about its financial condition, namely, artificially inflating its recurring monthly revenue (or "RMR") in Borrowing Base Certificates that it was required to deliver to Plaintiff, on a monthly basis, under the governing loan agreement. The submission of these false and misleading Borrowing Base Certificates allowed the Borrower to maintain an aggregate principal balance on the Revolving Loans that was more than twice the lending limit set by the loan agreement.

6. At all times relevant hereto, the Borrower produced financial information to Plaintiff that was intentionally unreliable because the Borrower (a) did not bother to review the underlying data before sending information to Plaintiff and (b) failed to and continues to fail to properly maintain its books and records as required under applicable law and under the applicable loan documents.

7. Despite the Borrower's failure to meet its current obligations, its defaults under the loan documents and its fraudulent conduct, Plaintiff, in its sole discretion and without any obligation to continue to do so, has continued to fund, under the provisions of its loan documents, certain expenses (including but not limited to payroll and other expenses in the ordinary course of business) in order to preserve Plaintiff's collateral, maximize Plaintiff's recovery from collateralized assets and, importantly, to avoid a shutdown of the Borrower's

operations, which would have a devastating impact on third parties who rely on the Borrower's security monitoring services on a 24-hour basis.  Plaintiff is under no obligation to fund these expenses.  As set forth below, this voluntary process cannot continue without the installation of a Receiver.  Without a Receiver, Plaintiff faces irreparable damage and the continued loss in value of its collateral, and innocent third parties are threatened with irreparable damage as well.

## PARTIES, JURISDICTION AND VENUE

8.      Plaintiff is a national banking association chartered under the laws of the United States, with its principal place of business in Charlotte, North Carolina.  Accordingly, Plaintiff is a citizen of North Carolina.  Effective October 17, 2008, by virtue of a merger, Plaintiff is the successor in interest to LaSalle Bank with respect to the indebtedness that is the subject matter of this Complaint.

9.      Borrower is a New York corporation controlled by the Principals with its principal place of business at 75 West Merrick Road, Freeport, New York.

10.     NY Alarm Response is a Delaware corporation controlled by the Principals with its principal place of business at 75 West Merrick Road, Freeport, New York.

11.     NY Merch Prot is a Delaware corporation controlled by the Principals with its principal place of business at 75 West Merrick Road, Freeport, New York.

12.     The Borrower, NY Alarm Response, NY Merch Prot, and their affiliates share management, employees and technology, as well as office space in Freeport, New York.  Wahrsager and Fischer are the principals of and control each of the companies.  Their affiliates (and the Borrower's subsidiaries) include NationWide Digital Monitoring Co. Inc. d/b/a Smith & Wesson Security Services, and SeniorCare 911 LLC.

4

13.     The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

14.     This Court has jurisdiction over the subject matter of this controversy pursuant to 28 U.S.C. § 1332(a)(1).

15.     This Court has jurisdiction over the Borrower in that the Borrower is incorporated in New York and has its principal place of business in Freeport, New York.

16.     This Court has jurisdiction over the Affiliate Guarantors in that the Affiliate Guarantors have their principal place of business in Freeport, New York.

17.     Venue is proper in the Eastern District of New York in that the Defendants have their principal place of business in Freeport, New York.

## COMMON ALLEGATIONS

### The Loan Agreement and Guaranties

18.     Plaintiff, the Borrower, the Principals, and the Affiliate Guarantors are parties to that certain Loan and Security Agreement dated as of January 31, 2006 (as amended, restated, supplemented or modified from time to time, the "Loan Agreement")[1]

19.     Pursuant to the terms of the Loan Agreement, Plaintiff made loans to the Borrower in the total principal amount of $17,500,000, evidenced by that certain Replacement Revolving Note dated as of August 23, 2007 (the "Replacement Revolving Note").

20.     Pursuant to Section 3.1(a)(vii) of the Loan Agreement, each of the Affiliate Guarantors executed and delivered to Plaintiff a Continuing Unconditional Guaranty dated January 31, 2006 (together, the "Affiliate Guaranties," and each individually an "Affiliate Guaranty").

---

[1]     Capitalized terms used but not otherwise defined herein have the meaning attributed to them in the Loan Agreement.

5

21.     Pursuant to the terms of the Affiliate Guaranties, each of the Affiliate Guarantors unconditionally and absolutely guaranteed the payment in full, promptly on demand, of any and all indebtedness, obligations and liabilities of every kind and nature of the Borrower to Plaintiff.

22.     Pursuant to Section 5.1 of the Loan Agreement, as security for the payment and performance of the Borrower's Obligations, as defined, to Plaintiff, each of the Defendants, as Obligors under the Loan Agreement, granted Plaintiff a security interest in and to all of its assets.

### The Fraudulent Check-Kiting Scheme

23.     Starting in February 2010, the Borrower, under the active direction of Wahrsager, began "kiting" checks mostly between the Borrower's deposit account at Plaintiff's facility in Freeport, New York (the "Primary Account") and an unauthorized deposit account controlled by the Principals with Signature Bank (the "Signature Account"). In a typical kiting transaction, the Borrower would write a check on the Signature Account for which insufficient funds existed and deposit the check into the Primary Account. By taking advantage of the delay inherent in bank reconciliation of deposits (and a bank's not uncommon practice of honoring checks on the basis of uncollected balances), the Borrower was able to inflate the flow of cash into the Primary Account, creating the appearance of additional cash flow where none actually existed, and thereby allowing transfers to the Signature Account and vendors, among others, and allowing checks to be paid that otherwise would have been returned.

24.     Based on a review of the Primary Account statements, during the period from February 2010 through the end of August 2010, the Borrower deposited, into the Primary Account, more than one hundred checks in an aggregate amount exceeding $30 million that were later dishonored and returned, including several checks drawn on the Signature Account after such account was closed on July 16, 2010. The Borrower has admitted that this fraudulent

6

check-kiting scheme was implemented with full knowledge that there were insufficient funds to pay the checks deposited into the Primary Account.

25.     On or about August 30, 2010, Plaintiff discovered the check-kiting fraud and determined that the Borrower's Primary Account was significantly overdrawn. Since that time, in accordance with Sections 5.6 and 11.4 of the Loan Agreement and Article 9 of the Uniform Commercial Code, in order to preserve its collateral, and in addition to the overdraft created by the check-kiting fraud, Plaintiff, in its sole discretion (and without any obligation to continue to do so), has continued to fund the Borrower's ordinary course of business withdrawals from the Primary Account (the "Protective Advances") subject to the amount of (i) the overdraft relating to the check-kiting fraud and (ii) the Protective Advances not exceeding approximately $1.54 million in the aggregate. All such Protective Advances, as well as the overdraft relating to the check-kiting fraud, constitute "Bank Product Obligations" under Section 1.1 of the Loan Agreement and are part of the Borrower's Obligations to Plaintiff, as defined.

**The Borrower's Fraudulent Borrowing Base Misrepresentations**

26.     The Borrower's principal assets consist of individual contracts for the provision of its monitoring services to its residential and commercial customers. The customers include individuals, private companies, and public entities such as municipalities, hospitals and schools in New York.

27.     As the Borrower's revenue is principally comprised of periodic payments by parties to the Borrower's service contracts, Plaintiff and the Borrower agreed at pp. 3-4, and 12 of the Loan Agreement that the aggregate principal balance of all loans outstanding at any time under the Loan Agreement would be limited in amount to the lesser of $17,500,000.00, or the "Borrowing Base Amount," a dollar amount calculated as a function of the Borrower's current RMR (recurring monthly revenue).

7

28.    Pursuant to Section 7.9 of the Loan Agreement, the Borrower, on a monthly basis, certified and represented the accuracy of the Borrowing Base Amount, including in certificates dated July 31, 2010 (the "July Borrowing Base Certificate") and August 31, 2010 (the "August Borrowing Base Certificate"). The calculations set forth in the July and August Borrowing Base Certificates reflected a Borrowing Base Amount in excess of $17,500,000.00. Wahrsager delivered these Borrowing Base Certificates to Plaintiff by email.

29.    Following the discovery of the Borrower's check-kiting scheme, and in connection with discussions regarding a possible forbearance agreement premised upon the sale of the Borrower's business as a going concern, Plaintiff urged the Borrower to engage a third-party consultant to assist the Borrower in getting its books and records in order and to otherwise provide independent oversight of the Borrower's financial affairs. The Borrower retained the financial consulting firm of Getzler Henrich & Associates LLC ("Getzler") to re-examine the Borrower's RMR (recurring monthly revenue), among other things. Getzler discovered that the Borrower's eligible RMR was substantially lower than the Borrower had represented to Plaintiff and, as a result, the outstanding loans as of September 30, 2010 exceeded the Revolving Loan Availability, as defined, by more than $8 million on a $17.5 million facility.

30.    The Borrower significantly overstated and misrepresented its RMR, in at least the July and August Borrowing Base Certificates, in order to artificially inflate the Borrowing Base Amount in the certificates. This accounting gimmickry allowed the Borrower to borrow far in excess of its Revolving Loan Availability. This conduct was intentional, constituted fraud with respect to the Borrower's Obligations, as defined, under the Loan Agreement, and likely pre-dated July 2010.

8

**Failure to Maintain Accurate Books and Records**

31.    During the course of its investigation, Getzler also determined that the Borrower had failed to maintain adequate books and records; the records the Borrower did maintain were entirely unreliable. Using data supplied by the Principals, Getzler concluded that the Borrower's master list of RMR—containing details of over 40,000 customer relationships—may have been "fatally flawed".

**Failure to Remove Wahrsager From Control**

32.    Following the discovery of the check kiting scheme, Fischer, on behalf of the Borrower, stated that he would cause the removal of Wahrsager, an admitted fraudfeasor, from the day to day cash management operations of the Borrower. Nevertheless, Wahrsager is still in control of the operations and cash flow of the company. Indeed, and most egregiously, he continues to sign checks on the Borrower's accounts.

33.    On October 30, 2010, the Borrower terminated Getzler's services, claiming they were too costly, leaving the Borrower without critically needed independent oversight.

**Notices of Default and Demand for Payment**

34.    On September 10, 2010, after discovering the check-kiting scheme, Plaintiff sent the Borrower a Notice of Default outlining the existence and continuation of numerous specific known defaults under the loan documents (the "Initial Known Defaults") and inviting the Borrower to sit down for a business persons meeting.

35.    On October 27, 2010, following discovery of the fraudulently-prepared Borrowing Base Certificates, Plaintiff sent the Borrower a second Notice of Default reiterating the existence and continuation of the Initial Known Defaults, as well as certain additional specific known defaults under the loan documents.

9

36.     On October 28, 2010, Plaintiff sent the Borrower a Notice of Intent to Accelerate and to Begin to Exercise Remedies stating its intention to accelerate the Borrower's payment obligations if the parties did not promptly reach a mutually agreeable resolution.  The parties failed to reach a mutually agreeable resolution.

37.     On November 3, 2010, Plaintiff sent the Borrower a Notice of Imposition of Default Rate and Acceleration of Obligations (the "Acceleration Notice").  The Acceleration Notice declared immediately due and payable all of the Borrower's Obligations under the Loan Agreement, instituted the default rate of interest thereunder, and informed the Borrower of Plaintiff's intention to make protective advances subject to the amount of (i) such protective advances and (ii) the overdraft relating to the check-kiting fraud not exceeding approximately $1.54 million in the aggregate.  Plaintiff increased this limit to $1,541,596.96, pursuant to an Addendum to Notice of Imposition of Default Rate and Acceleration of Obligations.

38.     On November 15, 2010, Plaintiff notified the Borrower of the occurrence of an Event of Default, as defined, under that certain ISDA Master Agreement dated as of February 28, 2006, by and between Plaintiff and the Borrower (the "Master Agreement"), and, as a result of the Event of Default, declared an Early Termination Date, as defined under the Master Agreement, and terminated all transactions under the Master Agreement (the "Early Termination Notice").  On November 17, 2010, Plaintiff notified the Borrower that the Borrower owed Plaintiff $89,800.00 on account of the termination of the transactions under the Master Agreement (the "Calculation Statement") and demanded immediate payment thereof from the Borrower.  The Borrower's liability under the Master Agreement constitutes a "Hedging Obligation" under Section 1.1 of the Loan Agreement and is part of the Borrower's Obligations to Plaintiff, as defined.

10

39.     On November 18, 2010, Plaintiff brought suit against the Principals, as guarantors of the Borrower's Obligations, as defined.  That action is entitled *Bank of America, N.A. v. Mark Fischer and Wayne M. Wahrsager*, No. 10-cv-07449 (N.D. Ill.).

40.     On December 20, 2010, Plaintiff demanded payment in full from each of the Defendants by sending them a Notice of Demand for Payment (the "Payment Demand").

**Outstanding Amount under the Loan Agreement**

41.     As of (and continuing after) December 20, 2010, the Borrower owed Plaintiff approximately $19,282,130.64.  This amount consists of $17,500,000.00 in principal advances under the Loan Agreement, $256,169.64 in accrued and unpaid interest thereon through December 20, 2010, and $1,436,054.14 in (a) the overdraft caused by the Borrower's check-kiting scheme and (b) Protective Advances, which may thereafter increase to an amount not exceeding $1,541,596.96 in the aggregate from time to time.  Interest at the Default Rate is accruing daily on the foregoing amounts.

42.     The amount owing also includes $89,906.86 for Hedging Obligations, as defined, resulting from the early termination of the Master Agreement.  Interest is accruing daily on the Hedging Obligations at the Applicable Rate set forth in the Master Agreement.

**Emergency Need for the Appointment of a Receiver**

43.     Plaintiff seeks the appointment of a receiver to take possession of, manage and control the Defendants' business.  As set forth in paragraphs 23 – 30 above, the Borrower, under the active direction of the Principals, has engaged in fraudulent conduct, including a more than $30 million check kiting scheme and a more than $8 million borrowing base fraud.  The Principals, who have shown that they are untrustworthy, remain in control of Plaintiff's collateral with no oversight at all.

11

44.     Defendants have a negative cash flow.  Defendants are unable to fund their payroll and ongoing obligations to critical vendors without the continued voluntary infusion of cash from Plaintiff.

45.     If Plaintiff stopped making voluntary Protective Advances, Defendants would be unable to service their monitoring contracts.  Such a failure would leave the Defendants' customers without protection monitoring, causing them to scramble for other coverage and terminate their contracts.  The results would be catastrophic and would result in a total loss of Plaintiff's collateral.  Recovery of anything other than nominal value is dependent upon selling the collateral on a going concern basis.

46.     To date, the Defendants continue to incur ordinary course business expenses, including payroll obligations and obligations to critical third-party vendors in excess of their combined revenue.  Given this cash flow crisis, the Defendants' assets -- Plaintiff's collateral -- are at substantial risk of dissipation and are in imminent danger of being lost, concealed, injured, diminished in value, or squandered, and the Defendants are in danger of suddenly ceasing operations.  Such a failure of the Defendants' business would irreparably harm Plaintiff.

47.     Plaintiff's willingness to continue funding was dependent upon the Defendants' utmost cooperation, but the Borrower, Wahrsager and Fischer refused to cooperate with Plaintiff after Plaintiff filed suit against Wahrsager and Fischer on their guaranties.  Despite the fact that the Borrower persists in seeking additional funding from Plaintiff, its Principals refuse to return phone calls, voice mail, or emails, instead leaving critical communications about cash flow needs to a marketing manager rather than a financial officer of the Borrower.

48.     On December 31, 2010, Plaintiff's fears about leaving the Borrower without oversight were confirmed when Eric Wahrsager, who resigned the day before, admitted, in a

12

letter to Plaintiff's counsel, that the Borrower's assets were "quickly dwindling" and further conceded that "over the past several months, the assets of [the Borrower] have severely deteriorated and are continuing to deteriorate at a rapid pace."

49.    Plaintiff, which cannot continue funding the Borrower unless appropriate oversight is put in place, will be irreparably harmed if a receiver is not appointed over Defendants.

50.    The harm to Plaintiff if a receiver is not appointed far outweighs any potential harm to Defendants from the appointment of a receiver.  No prior application for similar relief has been made.

51.    The interest of innocent third parties, including    individuals, companies, municipalities, hospitals and schools, all of whom rely on 24-hour a day protective monitoring, favors appointment of a receiver.

52.    With more than $19 million due, owing and in default, Plaintiff has a probability of success on the merits.

## COUNT I:
### For Breach of the Loan Agreement (Against the Borrower)

53.    Plaintiff restates and realleges paragraphs 1-52 as if fully set forth in this paragraph.

54.    The Borrower received the Payment Demand on or shortly after December 20, 2010.

55.    Despite receiving the Payment Demand, the Borrower has failed to pay any of the amounts due and owing to Plaintiff as set forth above.

56.    As a result of its failure to pay the amounts due and owing, the Borrower has defaulted on its obligations under the Replacement Revolving Note.

13

57.     Under the terms of Section 12.19 of the Loan Agreement, the Borrower is responsible for paying all costs of collection, including reasonable attorney's fees and court costs, incurred or paid by Plaintiff in collecting the Revolving Replacement Note or any part thereof.

58.     All conditions precedent to maintenance of this action have been met.

## COUNT II:
### For Collection Under Guaranty (Against NY Alarm Response)

59.     Plaintiff restates and realleges paragraphs 1-52 as if fully set forth in this paragraph.

60.     Under the express terms of its Affiliate Guaranty, NY Alarm Response is required to satisfy all of the Borrower's indebtedness owing to Plaintiff, including all of the Borrower's Obligations under the Loan Agreement, without limitation, including the aggregate amounts set forth above.

61.     NY Alarm Response received the Payment Demand on or shortly after December 20, 2010.

62.     Despite receiving the Payment Demand, NY Alarm Response has failed to pay any of the amounts due and owing to Plaintiff as set forth above.

63.     NY Alarm Response's failure to pay upon demand constitutes a breach of its Affiliate Guaranty.

64.     Pursuant to the express terms of its Affiliate Guaranty, NY Alarm Response also is personally liable for the payment of all costs, legal expenses and attorneys' fees of every kind, with interest. Plaintiff has incurred, and will continue to incur, significant expenses, including attorneys' fees, in enforcing the NY Alarm Response Guaranty and in connection with this proceeding.

14

65.     All conditions precedent to the maintenance of this action have been met.

## COUNT III:
### Breach of Guaranty (Against NY Merch Prot)

66.     Plaintiff restates and realleges paragraphs 1-52 as if fully set forth in this paragraph.

67.     Under the express terms of its Affiliate Guaranty, NY Merch Prot is required to satisfy all of the Borrower's indebtedness owing to Plaintiff, including all of the Borrower's Obligations under the Loan Agreement, without limitation, including the aggregate amounts set forth above.

68.     NY Merch Prot received the Payment Demand on or shortly after December 20, 2010.

69.     Despite receiving the Payment Demand, NY Merch Prot has failed to pay any of the amounts due and owing to Plaintiff as set forth above.

70.     NY Merch Prot's failure to pay upon demand constitutes a breach of its Affiliate Guaranty.

71.     Pursuant to the express terms of its Affiliate Guaranty, NY Merch Prot also is personally liable for the payment of all costs, legal expenses and attorneys' fees of every kind, with interest.  Plaintiff has incurred, and will continue to incur, significant expenses, including attorneys' fees, in enforcing the NY Merch Prot Guaranty and in connection with this proceeding.

72.     All conditions precedent to the maintenance of this action have been met.

WHEREFORE, Plaintiff Bank of America, N.A., prays for:

(a) the entry of judgment in favor of Plaintiff and against Defendants New York Merchants Protective Co., Inc., New York Merchants Alarm Response Inc., and NY Merch Prot

15

Co., Inc., and each of them, in the amount of $19,282,130.64, plus any additional Protective Advances through the date of judgment, plus all accruing *per diem* interest amounts through the date of judgment and thereafter at the maximum post-judgment rate provided by applicable law, plus all costs of collection (including, without limitation, attorneys' fees),

(b) temporary and permanent equitable relief including, but not limited to, the appointment of a Receiver to take possession, manage and control the business of New York Merchants Protective Co., Inc., New York Merchants Alarm Response Inc., NY Merch Prot Co., Inc., pending sale of the business or until further order of Court, and

(c) for such other and further relief to Plaintiff as this Court deems just, proper, and equitable under the circumstances.

Dated: New York, New York
       January 5, 2011

                                        MAYER BROWN LLP

                                        By: *Jean-Marie Atamian*
                                        Jean-Marie Atamian
                                        Frederick D. Hyman
                                        1675 Broadway
                                        New York, New York 10019
                                        Tel: (212) 506-2500
                                        Attorneys for Plaintiff

                                        MAYER BROWN LLP
                                        Thomas S. Kiriakos
                                        Beverley J. Klein
                                        Michael W. Ott
                                        71 South Wacker Drive
                                        Chicago, Illinois 60606
                                        Tel: (312) 782-0600
                                        Attorneys for Plaintiff

16