UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

RONALD J FRIEDMAN, *as Receiver for*
*New York Merchants Protective Co., Inc.,*
*New York Merchants Alarm Response, Inc.,*
*and NY Merch Prot Co., Inc.,*

                         Plaintiff,

                   - against -

WAYNE WAHRSAGER,
AARON WAHRSAGER,
ERIC R WAHRSAGER,
NATIONWIDE CENTRAL STATION
MONITORING CO., INC.,
NEW YORK MERCHANTS PROTECTIVE
CO., INC., NMP HOLDINGS CORP.
NATIONWIDE DIGITAL MONITORING
CO., INC., UNITED STATES MERCHANTS
PROTECTIVE CO., INC., NEW YORK
MERCHANTS ALARM RESPONSE, INC.,
NY MERCH PROT CO., INC.,
SENIORCARE911, LLC,

                       Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
**11 CV 815 (DRH)(ARL)**

**APPEARANCES:**

**Silverman Acampora LLP**
Attorneys for Plaintiff
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
By:  Robert J. Ansell

**LaMonica Herbst & Maniscalco LLP**
Attorneys for Defendants Aaron Wahrsager, Eric Wahrsager, Nationwide Central Station
Monitoring, and United States Merchants Protective Co. Inc.
3305 Jerusalem Avenue
Wantagh, New York 11793
By:  Joseph S. Maniscalco, Esq.

**HURLEY, District Judge:**

This action was commenced by Ronald J. Friedman ("plaintiff" or "Receiver"), who was appointed by this Court in a separate action entitled *Bank of America v. New York Merchants Protective Co. Inc., New York Merchants Alarm Response, and NY Merch. Prot. Co. Inc.*, No. 11-CV-38(DRH)(ARL)(E.D.N.Y.)(the "BOA Action") to act as the receiver to the defendant businesses in that case.  The individual defendants in this suit, Wayne Wahrsager and his two sons Eric and Aaron Wahrsager (collectively, the "Wahrsagers" or the "individual defendants"), are allegedly officers of the receivership businesses[1] named in the BOA Action.  In that action, the Bank of America sued to recover over $19 million in defaulted loans and overdraft payments from New York Merchants Protective Company ("NYMP").[2]  Here, the Receiver alleges that in the months prior to NYMP entering receivership, the Wahrsagers took steps to "intentionally sabotage the business and operations of NYMP." (Amended Complaint ("Am. Compl.") ¶ 57.)  The Receiver alleges 28 claims for relief, including that the defendants fraudulently conveyed the company's assets. (Am. Compl. *generally.*)[3]

Now before the Court is the motion of defendants Eric and Aaron Wahrsager, Nationwide Central Station Monitoring ("Central Station"), and United States Merchants Protective Co. Inc. ("USMP") to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Defendants Wayne

---

[1] The three receivership businesses are New York Merchants Protective Company ("NYMP"), New York Merchants Alarm Response, Inc., and NY Merch Prot Co., Inc.

[2] By Order dated October 19, 2011, the Court approved the private sale of the receivership estate.

[3] The Court has jurisdiction to hear the instant case pursuant to 28 U.S.C. § 1367, as a matter ancillary to the BOA action, which itself is based on diversity jurisdiction. *See Solid State Logic, Inc. v. Terminal Mktg. Co.*, No. 02 CIV. 1378, 2002 U.S. Dist. LEXIS 13061 (S.D.N.Y. July 18, 2002)("The ancillary suit is cognizable in the court of the main suit regardless of the citizenship of the parties or the amount of controversy because the res over which the receiver took control is already before the court." (citing *United States v. Franklin Nat. Bank*, 512 F.2d 245, 249 (2d Cir. 1975))); *see also Tcherepnin v. Franz*, 485 F.2d 1251, 1255 (7th Cir. 1973)("So long as an action commenced by a court appointed receiver seeks 'to accomplish the ends sought and directed by the suit in which the appointment was made, such action or suit is regarded as ancillary so far as the jurisdiction of the . . . courts of the United States [are] concerned.'" (quoting *Pope v. Louisville, New Albany & Chicago Ry. Co.*, 173 U.S. 573, 577 n.5, (1899))).

Wahrsager and SeniorCare911, LLC have answered the complaint.[4]  Although the moving

parties and the Receiver have repeatedly represented to the Court since this motion was filed in

April 2011 that the parties would be able to settle the matters raised therein, the Receiver

informed the Court by letter dated January 11, 2012 that an amicable resolution would not be

forthcoming. (*See* Letter from Receiver's Counsel dated 1/11/12, docket no. 143.)  For the

reasons that follow, defendants' motion is granted in part and denied in part.


## BACKGROUND

Although still only in the pleading stage, this case along with its sister case, the BOA

Action, has been the subject of multiple proceedings and applications over the past twelve

months.  The facts and procedural history recounted here will therefore be limited only to what is

necessary to decide the instant motion.  All well pled factual allegations are assumed true for

present purposes.


### I.   THE BUSINESS LOAN AND SUBSEQUENT DEFAULT

NYMP was formed in 1989, and since then has provided security alarm, fire alarm, and

life-safety alarm monitoring as well as other related services. (Am. Compl. ¶¶ 21-22.)  In January

2006, LaSalle Bank, predecessor to Bank of America, entered into an agreement to provide

NYMP up to $17.5 million in revolving loans.[5] (Am. Compl. ¶ 39.)  The amount of the revolving

loan was based primarily on the size of NYMP's "recurring monthly revenue," *i.e.*, revenue from

---

[4] Defendants NYMP, New York Merchants Alarm Response, Inc. and NY Merch Prot Co., Inc. did not respond to the amended complaint presumably because they are under receivership with the plaintiff.  The remaining defendants, NMP Holdings Corp. and Nationwide Digital Monitoring Corp., are neither in receivership, nor responded to the amended complaint.
[5] LaSalle Bank took a first priority perfected secured interest in NYMP's assets to cover the loan. (Am. Compl. ¶ 40.) Bank of America assumed that security interest when it acquired LaSalle Bank in 2007.

monthly payments to the company in exchange for the provision of monitoring services to its residential and commercial customers. (*See* Complaint filed in BoA Action ("BoA Compl.") ¶¶ 26-30, No. 11-cv-38, docket no. 1.)  Beginning in February 2010, NYMP, allegedly at the behest of Wayne Wahrsager, engaged in a check-kiting scheme, which accumulated approximately $1.4 million in overdrafts. (BoA Compl. ¶¶ 23-25, 41.)  Upon discovering this scheme, the bank directed NYMP, through a September 2010 notice of default, to engage the services of a financial auditor to "re-examine" the actual size of the company's monthly revenue. (BoA Compl. ¶¶ 29, 34.)  This audit determined that NYMP had "significantly overstated and misrepresented" the financial basis for the revolving loan. (BoA Compl. ¶ 30.)

Discovery of this alleged fraud prompted Bank of America on January 5, 2011 to commence the BoA action, and therein seek the appointment of a receiver, in order to recover the assets pledged under the loan agreement and the overdrafts resulting from the alleged check-kiting scheme.

## II.   THE ALLEGED "SABOTAGE" OF NYMP

Throughout the period of August 2010 to January 5, 2011 (hereinafter the "prelitigation period"), Wayne Wahrsager was allegedly an owner of NYMP, and his two sons, Aaron and Eric Wahrsager were allegedly officers and employees of the company. (Am. Compl. ¶¶ 57-60.) According to the amended complaint, during this time and for a period after the appointment of a receiver, the officers of NYMP "took several steps . . . to intentionally sabotage the business and operations of NYMP" (Am. Compl. ¶ 57), including:

1. "[P]urposely causing NYMP" to miss property tax payments, thereby forcing the company, under the terms of its lease, to surrender its lease for no consideration to the

4

landlord, a company in which Wayne Wahrsager holds a 10 percent stake (Am. Compl. ¶¶ 61-63), and then entering into a new lease with Central Station, a corporation wholly owned and run by defendants Aaron and Eric Wahrsager (Am. Compl. ¶¶ 55-56, 64);

2. "[S]hredd[ing] and destroy[ing] all of [NYMP's] customer contracts" (Am. Compl. ¶ 65);

3. Transferring "a significant portion of its assets [including some customer accounts] to Central Station for no consideration" (Am. Compl. ¶¶ 65-67);

4. Signing a contract with Central Station to provide "monitoring services" for NYMP's accounts at a cost of $50,000 per month – allegedly more than double the market rate (Am. Compl. ¶¶ 68-70);

5. Sending a letter to the company's "residential customers" which unilaterally terminated those customers' long-term monitoring contracts, retaining them solely on a month-to-month basis (Am. Compl. ¶ 74);

6. Calling NYMP customers to inform them that the security and fire alarm monitoring on their accounts was being turned off without notice (Am. Compl. ¶ 80);

7. Cancelling customer accounts and moving them to Central Station, or otherwise encouraging customers to switch from NYMP to Central Station or United States Merchants Protective Co. Inc. ("USMP") (Am. Compl. ¶¶ 83, 85);

8. Forming new corporate entities and renamed existing ones in an attempt to "hide and conceal the acts of sabotage," including changing NYMP's name to "NYMP Holdings Corp." and also forming a "new" NYMP owned by Eric Wahrsager (Am. Compl. ¶¶ 76-78);

9.   Wiping company servers of critical data allegedly to thwart the Receiver's attempts to run the business; and

10. Refusing the Receiver access to the company's computer system (Am. Compl. ¶ 84).

## III.   RELIEF SOUGHT

Plaintiff seeks (1) a permanent injunction enjoining the defendants or their associates from taking any action to harm the operations, business, reputation, and assets of the Receivership Businesses, (2) unfettered access by the Receiver to the operations and premises of Central Station and USMP, (3) an order setting aside any fraudulent conveyance of NYMP assets to Central Station and declaring such assets subject to the perfected security interest held by Bank of America, and (4) damages, costs and fees. (Am. Compl. ¶¶ 2, 188-91.)

## DISCUSSION

## I.   STANDARD OF REVIEW

### a.   *Motion To Dismiss Pursuant to Rule 12(b)(6)*

Rule 8(a) provides that a pleading shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The Supreme Court has clarified the pleading standard applicable in evaluating a motion to dismiss under Rule 12(b)(6).

First, in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), the Court disavowed the well-known statement in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. at 562. Instead, to survive a motion to dismiss under *Twombly*, a plaintiff must allege "only enough facts

to state a claim to relief that is plausible on its face." *Id*. at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 555 (citations and internal quotation marks omitted).

More recently, in *Ashcroft v. Iqbal*, -- U.S. --, 129 S. Ct. 1937 (2009), the Supreme Court provided further guidance, setting a two-pronged approach for courts considering a motion to dismiss.  First, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (*citing Twombly*, 550 U.S. at 555).

Second, "[w]hen there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.  The Court defined plausibility as follows:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 1949 (*quoting and citing Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In other words, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - - but it has not 'show[n]' - - that the pleader is entitled to relief." *Id.* at 1950.

### b.  *Documents Properly Considered On A Motion to Dismiss*

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court generally may only consider facts stated in the complaint or "[d]ocuments that are attached to the complaint or incorporated in it by reference." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Gillingham v. GEICO Direct*, No. 06-CV-2915,  2008 U.S. Dist. LEXIS 4169, *6 (E.D.N.Y. Jan. 18, 2008) (same).  A document not appended to the complaint may be considered if the document is "incorporated [in the complaint] by reference" or is a document "upon which [the complaint] solely relies and . . . is integral to the complaint." *Roth*, 489 F.3d at 509 (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)) (emphasis in the original).  "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint*." DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)); *see also Cortec Indus.*, 949 F.2d at 47 ("when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] . . . which is integral to the complaint, the defendant may produce [it] when attacking the complaint for its failure to state a claim, because plaintiff should not be allowed to escape the consequences of its own failure").  "However, 'even if the document is "integral" to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or

accuracy of the document.'"  *DiFolco*, 622 F.3d at 111 (quoting *Faulkner v. Beer*, 463 F.3d 130,

134 (2d Cir. 2006)).


## II.   DEFENDANTS' FIDUCIARY RELATIONSHIP

Defendants first argue that plaintiff's claims for breach of the duty of loyalty and

fiduciary duty against Aaron and Eric Wahrsager (claims numbered three through six) must be

dismissed for failure to state a claim because plaintiff has failed to "prove" that either of these

individuals were officers or directors of the NYMP. (Ds' Memo at 7-11; Ds' Reply at 3-4.)  This

argument, however, reflects a fundamental misapprehension by defendants of plaintiff's burden

at the pleading stage.  Plaintiff need not "prove" any element of a claim in the amended

complaint.  Rather, he must *allege* "only enough facts to state a claim to relief that is plausible on

its face." *Twombly*, 550 U.S. at 570.

Under New York law, a claim for breach of fiduciary duty requires "the existence of a

fiduciary relationship, misconduct by the defendant, and damages that were directly caused by

the defendant's misconduct." *Guarino v. No. Country Mortg. Banking Corp.*, 79 A.D.3d 805,

807, 915 N.Y.S.2d 84 (2d Dep't 2010).  "Directors and officers typically owe fiduciary duties to

the corporation and its shareholders, which include a 'duty of care' and a 'duty of loyalty.'" *RSL

Communs. PLC v. Bildirici*, No. 04-CV-5217, 2006 U.S. Dist. LEXIS 67548 (S.D.N.Y. Sept. 14,

2006)(citing *Gully v. NCUA Bd.*, 341 F.3d 155, 165 (2d Cir. 2003) and *Norlin Corp. v. Rooney,

Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984)).

Here, plaintiff's claims of a fiduciary relationship are based on the allegations that Aaron

and Eric were officers of NYMP during the period in question. (Am. Compl. ¶¶ 59-60.)  Whether

Aaron and Eric actually were officers of the company, and whether they owed such fiduciary

duties, is necessarily a factual inquiry not before the Court at this stage of litigation.  Plaintiff has

alleged sufficient facts to state a claim for breach of fiduciary duty and duty of loyalty, and the Court accepts all well-pled allegations as true for the purpose of deciding this motion. Therefore, defendants' argument that such claims should be dismissed at this stage because "the Receiver has failed to present any evidence, beyond his untrue assertion that Aaron [and Eric] [were] officer[s] of NYMP, to prove that [they] owed a fiduciary duty toward NYMP" is simply incorrect.[6]  Accordingly, defendants' motion to dismiss claims three through six is denied.

### III.   FRAUDULENT CONVEYANCE

#### a.   The Receiver Has Standing to Assert Claims for Fraudulent Conveyance

Defendants next argue that plaintiff's fraudulent conveyance claims against Central Station (claims seven through eleven) should be dismissed because "in order to set aside a fraudulent conveyance, one must be a creditor or the transferor . . . .  [R]eceivers have standing to pursue fraudulently conveyed assets only when one of the entities in receivership is a creditor of the transferor." (Ds' Memo at 11-12 (quoting *Eberhard v. Marcu*, 530 F.3d 122, 129 (2d Cir. 2008))); *see also* N.Y. Debtor & Creditor Law ("DCL") § 276 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.").  The Receiver, defendants continue, "stands in the shoes of NYMP and can only bring those causes of action that could have been brought by NYMP.  Because NYMP made the allegedly fraudulent transfer to Central Station, NYMP would not be permitted to sue Central Station to avoid the allegedly fraudulent transfer." (Ds' Memo at 12.)

---

[6] Furthermore, none of the documents referred to in defendants' reply on this point are attached to the amended complaint, or otherwise incorporated or relied upon therein.  The Court therefore cannot consider these documents at the pleading stage. (*See* discussion in section I(b) *supra.*

However, as plaintiff rightly points out, he was appointed by this Court as Receiver not just to NYMP, but also to New York Merchants Alarm Response, Inc. and NY Merch Prot Co., Inc. (collectively, the "Corporate Guarantors"),[7] both of which served as guarantors to the original loan from LaSalle Bank. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion Seeking Dismissal of the Amended Complaint, ("Pl's Memo") at 5; *see also* Loan and Security Agreement ("Loan Agreement") at 56, attached to the Am. Compl. as Exhibit 8.)  Both Corporate Guarantors are liable to the lender for the full amount of the loan (Loan Agreement §11), both pledged their assets as security under the loan (*see* Loan Agreement, "Group Exhibit G"), and both are defendants in the BoA action to collect on NYMP's obligations under the loan agreement, (BoA Complaint, Count II-III, ¶¶ 59-72).

Under DCL § 270, a "creditor" is defined as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  As guarantors to the original Loan Agreement and defendants in the BoA action, the Corporate Guarantors possess a potential secondary liability claim in that action against NYMP for its default.  *See Pro-Specialties, Inc. v. Thomas Funding Corp.*, 812 F.2d 797, 799 (2d Cir.1987)("The general rule is that 'a surety is equitably entitled to full indemnity against the consequences of a principal obligor's default.'"); *see also Lori-Kay Golf, Inc. v. Lassner*, 61 N.Y.2d 722, 723, 460 N.E.2d 1097(1984).

Though the Corporate Guarantors have not yet asserted a secondary claim against NYMP in the BoA action, the expansive definition of creditor under DCL § 270, which includes "any claim . . . fixed or contingent," nevertheless qualifies them as creditors of NYMP, and confers standing on the Receiver to bring fraudulent conveyance claims on their behalf. *See Drenis v.*

---

[7] The Corporate Guarantors were, at the time the Loan Agreement was signed, each owned by the same two individuals who owned NYMP, namely Wayne Wahrsager and Mark Fischer. (Loan Agreement, Schedule 6.1.)

*Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) ("Under New York's broad definition of 'creditor,' one who has a right to maintain a tort action but has not recovered judgment at the time of the transfer is a creditor and it is now accepted that the relationship of debtor and creditor in tort cases arises the moment the cause of action accrues." (quoting *Marcus v. Kane,* 18 F.2d 722, 723 (2d Cir. 1927) and *Shelly v. Doe*, 249 A.D.2d 756, 757 (3d Dep't 1998))).[8]

In their reply, defendants respond that the Corporate Guarantors may not be considered creditors of NYMP, because they are mere "shell entities." (Ds' Reply at 6.) First, defendants do not define precisely what a "shell entity" is, nor do they articulate why being labeled a "shell entity" would necessarily strip the Corporate Guarantors of their status as creditors. Second, the very same case cited by defendants in support of their standing arguments, *Eberhard*, 530 F.3d 122, militates against the result that they now urge here. *Eberhard* cites a Seventh Circuit case in which a similar situation occurred. *Id.* at 132-33 (citing *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)). In *Scholes*, an individual created three corporations which then created limited partnerships with each other. *Eberhard*, 530 F.3d at 132. The receiver in that case represented both the individual and the three corporations. In response to a challenge to the receiver's attempts to recover assets fraudulently conveyed to third parties, the Seventh Circuit concluded that the subject corporations, though "robotic tools" of their creator, were nevertheless "distinct legal entities with separate rights and duties." *Scholes*, 56 F.3d at 754. "The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil

---

[8] In their reply, defendants cite the Statute of Elizabeth (the ancient predecessor to modern fraudulent conveyance law) for the more general proposition that "a transferor cannot set aside a disposition of assets on the ground that the disposition allegedly constituted a fraudulent transfer." (Ds' Reply at 5 (quotes and citations omitted).) As discussed above, however, the Receiver asserts the claims for fraudulent conveyance by virtue of his appointment to oversee the Corporate Guarantors, not NYMP. To the extent that defendants also argue that the Statute of Elizabeth prohibits the Corporate Guarantors from acting as creditors for unperfected (and thus-far unasserted) claims, the Court notes that the codification of the law of fraudulent conveyance through New York's Debtor and Creditor Law, "abrogate[d] the ancient rule whereby a judgment and a lien were essential preliminaries to equitable relief against a fraudulent conveyance." *American Surety Co. v. Conner*, 251 N.Y. 1, 7, 166 N.E. 783 (1929).

zombies. Freed from his spell they became entitled to the return of the moneys . . . that Douglas had made the corporations divert to unauthorized purposes." *Id.*  To the extent that defendants' arguments that the Corporate Guarantors are mere "shell entities" mirrors the same arguments raised in *Scholes*, those arguments are without merit.  The Corporate Guarantors here are "distinct legal entities" to which the Receiver was assigned, *inter alia*, to recover any assets to which they are legally entitled; the Receiver's standing to recover such assets is part and parcel of that assignment.

Defendants also argue in their reply that the Receiver, by virtue of the fact that he is appointed to oversee both a debtor (NYMP) and its creditors (the Corporate Guarantors), is laboring under "an inherent conflict [of interest] that the Receiver cannot ignore." (Ds' Reply at 6.)  Defendants further insist that because the Receiver is acting as "debtor and creditor at the same time," each of the Corporate Guarantors should be appointed their own receivers, separate from NYMP's. (*Id.*)  Defendants, however, cite no authority for either proposition.  Although it is theoretically possible for a conflict of interest to arise in the course of this or any receivership, the Court finds nothing "inherent[ly]" improper about the Receiver's appointment to the three companies here.  Indeed, such an arrangement is consistent with a receiver's charge to "step[] into the shoes of the debtor, and [to be] vested with his property as the arm of the Court for the benefit of the creditor."  *United States v. Mr. Hamburg Bronx Corp.*, 228 F. Supp. 115, 124 (S.D.N.Y. 1964) (citation omitted).  Notably, in the context of appointing receivers for the purpose of collecting a judgment, New York's receiver statute, N.Y. CPLR § 5228, specifically allows for the appointment of the judgment creditor as receiver to the judgment debtor. N.Y.

CPLR § 5228(a).[9]  Similarly, "[p]otential conflicts of interest do not of themselves disqualify creditors from being appointed trustees in bankruptcy, even when they have already acted as a receiver." *In re Freeport Italian Bakery, Inc.*, 340 F.2d 50, 54 (2d Cir.1965).

Defendants fail to articulate precisely how the Receiver's appointment here represents a conflict of interest.  There is no explanation, for example, why acting on behalf of the Corporate Guarantors to set aside the conveyed assets of NYMP would be at odds with the interests of NYMP, and under the facts alleged in the amended complaint the Court finds no support for any such assertion.

Accordingly, because the Receiver here stands in the shoes of the Corporate Guarantors, and because these guarantors are "creditors" to NYMP, as that term is defined in DCL § 270, plaintiff has standing to assert the present fraudulent conveyance claims.

### b.  Plaintiff has Stated Claims for Fraudulent Conveyance

Defendants next argue that plaintiff has failed to sufficiently plead each of their five claims for fraudulent conveyance under DCL §§ 273-276a, respectively.  Defendants' arguments seeking the dismissal of these claims are addressed below.

### i.  Fraudulent Conveyance Claims Without Regard to Actual Intent

To state claims under the three sections of New York's Debtor and Creditor Law that do not consider the actual intent of the transferor, *i.e.* DCL §§ 273-275, a plaintiff must allege that a conveyance was made without fair consideration, and that

> (1) the transferor is insolvent at the time of the conveyance or will be rendered insolvent by the transfer in question (§ 273); (2) as a result of the transfer in question, the transferor is left with

---

[9] The Court notes parenthetically that plaintiff was appointed as Receiver in the BoA action, a diversity case, pursuant to federal common law. *See Varsames v. Palazzolo,* 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)("Whether a federal court should appoint a receiver in a diversity action is governed by federal law.")

> unreasonably small capital to conduct its business (§ 274); [or] (3) as a result of the transfer in question, the transferor intends or believes that it will incur debt beyond its ability to pay (§ 275).

*Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 254 (S.D.N.Y. 2006)(citing DCL §§ 273-275).

Additionally, because plaintiff's claims under these three statutes implicate constructive fraud, as opposed to fraudulent intent, the heightened pleading standard embodied in Rule 9(b), Fed. R. Civ. P., does not apply. *Eclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.,* 375 F. Supp. 2d 257, 268 (S.D.N.Y. 2005)(citing *Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934)).

In their attack on the element common to all three of these statutes, *viz.* that the assets were conveyed without fair consideration, defendants argue that the amended complaint provides "little support for [this] assertion[] . . . beyond the mere allegation that the transfer was made for 'no consideration.'" (Ds' Memo at 13.)  While defendants are correct that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements," (Ds' Memo at 12 (citing *Twombly*, 550 U.S. at 557)), plaintiff here has pled ample facts to satisfy his burden under this element.  The amended complaint identifies the assets that were conveyed and alleges that the transferee, Central Station, was owned by Eric and Aaron Wahrsager, who were allegedly officers and/or employees of NYMP and the sons of one of NYMP's owners, Wayne Wahrsager.  Given this backdrop, and given the timing[10] and nature of NYMP's alleged default on what was a sizable business loan, plaintiff's allegation that the assets were conveyed to Central Station for no consideration whatsoever stand as far more than the "bald and conclusory allegations" that defendants make them out to be.

---

[10] Although defendants claim in their memorandum that the conveyances occurred in June of 2009 (Ds' Memo at 13, n.1), the amended complaint alleges that they occurred after August 2010, (Am. Compl. ¶¶ 57, 79).  The Court assumes, as it must, that all well pled allegations are true.

As to the "insolvency" element of DCL § 273, defendants argue that the corresponding allegation in the amended complaint (*see* Am. Comp. ¶ 115) is inadequate because it was made "without having conducted an insolvency analysis, or hiring an accountant to provide a balance sheet test," (Ds' Memo at 13).  This argument, again, vastly overstates plaintiff's pleading burden.  Plaintiff not required to take such measures before alleging that an entity was either insolvent or rendered insolvent as a result of the conveyance.  Regarding the sufficiency of the allegations of insolvency themselves, the Court does not consider these particular allegations in a vacuum.  Rather, the Court examines them in light of all of the facts alleged in the amended complaint.  Considering that NYMP allegedly effected or encouraged the transfer of its customer accounts to Central Station, and considering that NYMP had already, allegedly, defaulted on the subject business loan, the claim that NYMP had become insolvent, or would become insolvent through the purported conveyances is not an implausible allegation.  The Court also notes that attached to the amended complaint is a contract, mentioned above, in which Central Station agreed to provide electronic monitoring to NYMP for $50,000 per month.  In its preamble, the contract states that "[NYMP] is no longer able to fund its operation and is desirous of providing for the continued protection of its customers." (Agreement dated 11/5/10, attached to the Am. Compl. as Exhibit 13.)  Although this line in the agreement, signed during the period of the alleged conveyance, is by no means proof of NYMP's insolvency, it certainly lends support to the plausibility of plaintiff's claims in that regard.

Defendants launch a similar attack on the pivotal element of plaintiff's claim under DCL § 274, *i.e.* that the property remaining with the transferor amounts to "unreasonably small capital." DCL § 274.  With regard to defendants' first argument regarding this element, which assails plaintiff for not "present[ing] any evidence to support this conclusion," the Court directs

defendants' attention to its discussion *supra* regarding the role of evidence at the pleading stage. As to defendants' argument that plaintiff has merely recited this element of his DCL § 274 claim (*see* Ds' Memo at 15), the discussion above regarding the "insolvency" element of § 273 is equally applicable to plaintiff's allegation that NYMP was left with "unreasonably small capital." In sum, given the totality of the facts alleged in the amended complaint, plaintiff's allegations under DCL § 274 adequately state a claim for relief.

Finally, defendants appear to revisit their arguments regarding standing once again in their attack on plaintiff's claim under DCL § 275. Defendants begin by quoting the following from *Eberhard*: "[w]ere transferors allowed to assert fraudulent conveyance claims, . . . transferors would be empowered to rescind transactions by virtue of their own fraudulent or deceptive designs. Such empowerment would be perverse." *Eberhard*, 530 F.3d at 131. Leveraging this quote, defendants urge that "[h]ere, it would be perverse to allow the Receiver to find relief under DCL § 275 based solely on his own allegations as to the state of mind of the corporation." (Ds' Memo at 16.)

The Court is unclear precisely what defendants are arguing here. The perversion recognized by the Circuit in *Eberhard* related only to the transferor who seeks to void his own past fraudulent conveyances. As was made clear above in the Court's discussion of standing, the Receiver here asserts the DCL § 275 claims on behalf of the Corporate Guarantors, not NYMP, the transferor. Nevertheless, defendants appear to suggest that there is some additional, and unspecified, perversion inherent in the Receiver's assertion of claims that implicate the transferor's "state of mind."[11] The Court finds this argument, as presented, rather bewildering, and notes that defendants offer no relevant authority in support. The Court therefore rejects

_____

[11] DCL § 275 prohibits the conveyance of assets without fair consideration where the transferor "intends or believes that he will incur debts beyond his ability to as they mature."

defendants' arguments regarding to this claim, and otherwise finds that plaintiff has sufficiently stated a claim for relief under DCL § 275.

### ii. Fraudulent Conveyance Claims Implicating Fraudulent Intent

Plaintiff's final fraudulent conveyance claim is brought under DCL § 276, which bars conveyances made with "actual intent . . . to hinder, delay, or defraud either present or future creditors." *Id.* To state a claim under DCL § 276, the plaintiff must meet the heightened standard under Rule 9(b), Fed. R. Civ. P., which requires that the allegation be made with particularity. *Scantek Med., Inc. v. Sabella*, 583 F. Supp. 2d 477, 497 (S.D.N.Y. 2008); s*ee Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987)("Though DCL § 276 is triggered by an actual intent to hinder, delay, or defraud, all three [of those] means of damaging creditors are within a general category that the statute categorizes as 'fraudulent.'"). Such particularity of intent to defraud

> "may be inferred from circumstantial evidence, or 'badges of fraud,' including: (1) the inadequacy of consideration received in the allegedly fraudulent conveyance; (2) the close relationship between parties to the transfer; (3) information that the transferor was rendered insolvent by the conveyance; (4) suspicious timing of transactions or existence of a pattern after the debt had been incurred or a legal action against the debtor had been threatened; or (5) the use of fictitious parties."

*Eclaire Advisor*, 375 F. Supp. 2d at 268-69(citing cases).

As discussed earlier, plaintiff has alleged facts that speak to each of the first four factors above, notwithstanding defendants' insistence that plaintiff provides no "supporting proof or documentation" as to these factors. Again, even with plaintiff's elevated obligations under Rule 9(b), no such "proof" is required at this stage.

Plaintiff also seeks attorney's fees under DCL § 276-a, for any fees associated with a successful § 276 claim.  As plaintiff has adequately stated his claim for relief under § 276, his concomitant § 276-a claim may also proceed.

Accordingly, defendants' motion to dismiss plaintiff's fraudulent conveyance claims is denied.

## IV.   UNJUST ENRICHMENT

Plaintiff's twelfth claim alleges that Central Station was unjustly enriched through its acquisition of the purported fraudulent conveyances. (Am. Compl. ¶¶ 132-34.)  Unjust enrichment occurs where "1) [ ] the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)(internal citations and quotes omitted).

Defendants argue that equitable claims, such as unjust enrichment, are "unavailable where an adequate remedy at law exists," noting that plaintiff's claim here, "seeks only monetary relief, revealing that there is an adequate remedy at law." (Ds' Memo at 19 (citation omitted).) This argument, however, erroneously conflates the cause of action with the relief sought by plaintiff.

The principle cited by defendants, *viz.*, that unjust enrichment is unavailable where there is an adequate remedy at law, reflects the legal distinction between unjust enrichment, or "quasi-contract," claims and claims for damages resulting from a breach of contract. *See* Restatement of Restitution § 5.  As explained by the New York Court of Appeals:

> The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. A 'quasi contract' only applies in the absence of an express

19

agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment.

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190 (1987) (internal citations omitted).

In other words, under New York law, where the damages alleged in a complaint arise from the defendant's breach of a contract, the plaintiff's remedy lies in a contractual claim. Otherwise, where the claim does not involve a contract, as is the case here,[12] but is quasi-contractual in nature, the plaintiff may bring a claim for unjust enrichment.  *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006).

The problem with defendants' argument is that it suggests that an adequate legal remedy exists not because there is a contract involved, but because plaintiff seeks monetary damages.  In actual fact, the "adequate legal remedy," *viz.*, an action for breach of contract, is unavailable for a different reason, namely, because no contract relating to these assets exists between the parties. Plaintiff is therefore not precluded from asserting an unjust enrichment claim.

Moreover, plaintiff is not barred, as defendants suggest, from bringing an unjust enrichment claim that seeks only monetary damages.  Stated differently, unjust enrichment actions are not necessarily purely equitable claims.  "[C]laims for unjust enrichment where an award of money would fairly compensate the party bringing the claim" are considered "legal in nature." *Miller v. Epstein*, 293 A.D. 2d 282, 282 (1st Dep't 2002)(upholding the trial court's denial of a motion to strike a jury demand)(citing *Hudson View II Assoc. v. Gooden,* 222 A.D. 2d 163, 168 (1st Dep't 1996)); *see also Hudson View*, 222 A.D. 2d at 168 ("[E]ven if defendants are not pursuing damages as prescribed by the contract, these causes of action, which still seek only

---

[12] Under plaintiff's conversion claim, it alleges that there is no "valid enforceable" contract between NYMP and Central Station demonstrating that Central Station is the "rightful owner and holder" of the subject assets.

money damages, are quasi-contractual in nature and would, therefore, also have been actions at law. . .  This is so notwithstanding that the rationale underlying such causes of action is fairness and equitable principles in a general, rather than legal, sense.").

Plaintiff has otherwise sufficiently pled the three elements for unjust enrichment. Defendants' motion to dismiss this claim is therefore denied.

### V.    CONSTRUCTIVE TRUST

Plaintiff has withdrawn his claim for a constructive trust. (P's Memo at 13.)

### VI.    CONVERSION

Plaintiff's fourteenth claim for relief alleges that Central Station converted the conveyed assets for its own use. (Am. Compl. ¶¶ 138-43.) The specific allegations made under this claim state the following:

1) Plaintiff demanded from Central Station "documentation to prove it is the rightful owner and holder" of the assets. (Am. Compl. ¶ 138.)

2) Central Station failed to produce such "documentation." (Am. Compl. ¶ 139.)

3) No "valid enforceable" contract between NYMP and Central Station exists demonstrating that Central Station is the "rightful owner and holder" of the assets. (Am. Compl. ¶ 140.)

4) In light of "the actions of all defendants," it would be "futile" to demand return of the assets from Central Station. (Am. Compl. ¶ 141.)

As this conversion claim implicates only Central Station and no other defendant, the inquiry here focuses solely on those assets alleged in the pleading to be in Central Station's

possession or control.  In that regard, plaintiff alleges that "the NYMP Officers caused NYMP to transfer a significant portion of its assets to Central Station for no consideration." (Am. Compl. ¶ 66.)  These particular "assets" included "certain NYMP customer accounts" as well as various "assigned assets." (Am. Compl. ¶ 67.)  The amended complaint defines the "assigned assets" as "certain phone numbers, [Nationwide Digital Inc.'s ("Digital")] website, Digital's customer list, Digital's accounts and receivables, and certain intellectual property." (Am. Compl. ¶ 48, Exhibit 10.)  These items were previously assigned to Wayne Wahrsager, Eric Wahrsager, NYMP, SeniorCare911, and Nationwide Digital Monitoring Co. Inc. by Peter and Meryle Deck (previous partial owners of Nationwide Digital Inc.) in settlement of two consolidated cases in state court, and in consideration for $1,150,000 payable in monthly installments. (*See* Am. Compl., section entitled "Corporate History.")

Under New York law, "conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property. . . . Where the original possession is lawful,[13] a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property." *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53 (2d Cir. 1993) (citing *Johnson v. Gumer*, 94 A.D.2d 955 (4th Dep't 1983)); *see also Tompkins v Fonda Glove Lining Co.*, 188 N.Y. 261, 80 N.E. 933 (1907).

Central Station argues that it came into possession of the assets lawfully, *i.e.* that there is no dispute that NYMP was the rightful possessor of the assets at the time NYMP allegedly transferred them to Central Station. (Ds' Memo at 21.)  It further contends that "because [it] was

---

[13] Unlawful possession, however, "need not amount to theft or misappropriation. Rather, 'it is sufficient if there be interference with the owner's dominion over his property to the exclusion of his rights.'" *Leveraged Leasing Admin. Corp. ex rel. Dweck v. Pacificorp Capital*, 87 F.3d 44, 50 (2d Cir.1996)(quoting *Mendelson v. Boettger*, 257 A.D. 167, 169-70, (2d Dep't 1939), aff'd, 281 N.Y. 747, 23 N.E.2d 554 (1939)).

lawfully in possession of the allegedly fraudulently conveyed assets, the failure to make demand for their return is fatal to [the conversion claim.]"[14] (*Id.*)

Assuming, *arguendo*, that Central Station did in fact legally possess the assets in the first instance, this alone does not defeat plaintiff's conversion claim.  In cases analogous to the one at bar, where a possessor innocently purchases stolen property, the possessor must "first be informed of the defect in his title, and have an opportunity to deliver the property to the true owner, before he shall be made liable as a tort feasor for a wrongful conversion." *Employers' Fire Ins. Co. v. Cotten*, 245 N.Y. 102, 105, 156 N.E. 629 (1927)(quoting *Gillet v. Roberts*, 57 N.Y. 28, 34 (1874)).  In such cases, however, an actual "demand" for the return of property is futile, where "circumstances show that the defendant knows it has no right to the goods." *State v. Seventh Regiment Fund*, 98 N.Y.2d 249, 260, 774 N.E.2d 702 (2002).  Where, "prior to the institution of [an action for conversion], defendant had full information relating to her own defect in title and the identity of the true owner," the rule requiring demand and refusal in order to bring such an action does not apply. *Cotten*, 245 N.Y. at 106; *see id.* at 104 (distinguishing its holding from cases where the person in possession was not "clearly informed" that the "title was wholly defective"); *see also American Fin. Servs. Group, Inc. v. Treasure Bay Gaming & Resorts, Inc.*, No. 99 Civ. 1068, 2000 U.S. Dist. LEXIS 8668, *39 n.7 (S.D.N.Y. June 23, 2000)("Although demand for return of property by the aggrieved party is generally an essential element of conversion, no formal demand for return is necessary where the person having possession, even lawful in the first instance, is informed of the true facts.").

According to the amended complaint, plaintiff "demanded that Central Station produce documentation to prove it is the rightful owner." (Am. Compl. ¶ 138.)  Although the allegations

---

[14] The Court cannot consider the affidavit of defendants' counsel submitted in support of the assertion that no demand for the return of the assets was ever made, as it is outside the pleadings. (See Affirmation of Joseph Maniscalco, attached to Ds' Memo); *see also* Discussion section I(b) *supra*.

do not explicitly state that the Receiver "informed" Central Station of NYMP's claimed right to the assets, the implication from the demand for proof of ownership under the circumstances alleged is that NYMP contended it had a superior right to possess the transferred assets.  Central Station was therefore informed of a potential defect in its possession of the assets.  A demand for the assets' return would therefore be a futile and "useless procedure." *See Cotten*, 245 N.Y. at 104, and thus, even if Central Station came into possession of the assets lawfully, the Receiver's conversion claim may proceed.

### VII.   TORTIOUS INTERFERENCE WITH A CONTRACT

Plaintiff's sixteenth and seventeenth claims allege that Aaron and Eric Wahrsager "intentionally and improperly procured" a breach of the contracts that several of NYMP customers held with NYMP by contacting these customers directly "in a blatant attempt to interfere with the known and existing contractual relationships." (Am. Compl. ¶¶ 149-56.) Specifically, plaintiff alleges that "the NYMP Officers," (which allegedly include the Wahrsager brothers) sent customers letters unilaterally terminating their contracts with NYMP (Am. Compl. ¶¶ 74, 82), that Eric Wahrsager called many of these customers to inform them that their alarm monitoring service would be turned off (Am. Compl. ¶ 80), and that both moved these customer accounts to Central Station (Am. Compl. ¶ 83).

Under New York law, a tortious interference claim must allege "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001).  Plaintiff must also allege that

the breach would not have occurred "but for" the conduct of the defendants. *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990).

Defendants' primary argument against these claims is that plaintiff fails to provide "proof" that Aaron or Eric had any involvement in the cancellation letters, which were signed solely by Wayne Wahrsager, or "proof" that the cancellation letters actually "caused NYMP customers to breach their contracts." (Ds' Memo at 21-23.) The Court, again, sets aside the matter of "proof" at this juncture, as it does the affidavit from Eric Wahrsager attached to defendants' motion that purportedly "corroborates" his lack of involvement with the cancellation letters. (*See id.*)

However, there is a separate issue within this claim that defendants do not raise, but which the Court nonetheless deems important to address. The facts in this case present a rather different scenario from the typical tortious interference claim, because the ones alleged to have interfered with the contract were allegedly officers of one of the parties to that contract. In that setting, officers generally are not considered third parties to the contract. *See Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 228 (S.D.N.Y. 2004); *see also Murtha v. Yonkers Child Care Ass'n*, 45 N.Y.2d 913, 915 (1978)("A director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken.")(citation omitted). Indeed, "[f]or an agent of a party to the contract to qualify as a 'third party,' the plaintiff must demonstrate that the agent acted outside the scope of his authority [ ] or 'committed an independent tortious act against the plaintiff.'" *Roselink*, 386 F. Supp. 2d at 228(quoting *Albert*, 239 F.3d at 275). For instance, a plaintiff may allege "that defendants' acts were taken outside

the scope of their employment or that defendants personally profited from their acts." *G.D. Searle & Co. v. Medicore Communications*, 843 F. Supp. 895, 911 (S.D.N.Y. 1994)(internal alterations)(quoting *Courageous Syndicate, Inc.*, 141 A.D.2d 599, 600 (2d Dept. 1988)); *see also Petkanas v. Kooyman*, 303 A.D.2d 303, 305 (1st Dep't 2003)(distinguishing acts motivated by "personal gain" from those motivated by a "gain for the corporation").

In terminating the contracts with NYMP's customers, the Wahrsager brothers were in the most ostensible sense acting within the scope of their authority as corporate officers.  In other words, one could presume that their positions conferred on them the power to enter and terminate contracts on behalf of the company.  And, as noted above, liability on this claim would not attach solely because defendants took steps to effectuate the breach of a contract to which the corporation itself is a party.   Moreover, the allegations pertaining to these particular claims, *i.e.* paragraphs 149-56 of the pleading, do not specifically allege that defendants acted outside their authority, nor does the plaintiff address this issue in his opposition.

Nevertheless, these claims incorporate "all prior allegations," and in looking at the entirety of the pleading, it is clear that plaintiff alleges facts that suggest the Warhsager brothers "personally profited from their acts," arguably at the expense of NYMP and its creditors.  Specifically, according to the amended complaint, after terminating the customer accounts with NYMP, defendants "mov[ed] them from NYMP to Central Station" (Am. Compl. ¶ 83), a company wholly owned by Eric and Aaron Wahrsager, (Am. Compl. ¶¶ 55-56).  In essence, the Wahrsager brothers used their position as officers of NYMP to diminish the customer and revenue base of that company in an effort to bolster the profit of their own company.  This alleged conduct falls well outside the scope of both their authority and their duties owed to

NYMP; the Wahrsager brothers may therefore be considered third parties under plaintiff's claim for tortious interference with a contract.

As plaintiff has sufficiently pled all of the elements of this claim, including the final element pertaining to the damages incurred through the procurement of the breach, defendants' motion to dismiss this claim is denied.


### VIII.    TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

Implicating similar alleged conduct as his claim for tortious interference with a contract, plaintiff also alleges in claims 19 through 21 that Eric and Aaron Wahrsager, and USMP, tortiously interfered with the business relationship NYMP cultivated with its customers. (Am. Compl. ¶¶ 159-64.)

Under New York law a plaintiff seeking to recover for tortious interference with business relations must allege "(1) there is a business relationship between plaintiff and a third party;[15] (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair or improper means; and (4) the relationship is injured." *Goldhirsh Group v. Alpert*, 107 F.3d 105, 108-09 (2d Cir. 1997).

In *Carval Corp. v. Noonan*, 3 N.Y.3d 182, 818 N.E.2d 1100 (2004) the New York Court of Appeals reiterated that greater protection is accorded an interest in an existing contract than to the less substantive, more speculative interest in a prospective business relationship.  Therefore, allegations of more culpable conduct on the part of the defendant is required for the tort of interference with business relations than for the tort of interference with contract. *Id.* at 189-90

---

[15] Any question whether the Wahrsager brothers, as officers of NYMP, may be considered third parties here is addressed above within the discussion of plaintiff's claim for tortious interference with a contract. *See* Section VII, *supra.*

(*citing NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 664 N.E.2d 492

(1996).  Thus, "as a general rule, the defendant's conduct must amount to a crime or an

independent tort" because "[c]onduct that is not criminal or tortious will generally be lawful and

thus insufficiently culpable to create liability for interference with prospective contracts or other

non-binding economic relations." *Id.* at 190.  The requirement that the conduct amount to a crime

or independent tort is, however, a "general rule."  The *Carvel* court also held that "wrongful

means" may also include "some degree of economic pressure" and that economic pressure must

be directed at the party with which the plaintiff has or seeks to have a relationship and must be

"extreme and unfair" to be wrongful. *Id.* at 192-93.  "Wrongful means include physical violence,

fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic

pressure; they do not, however, include persuasion alone although it is knowingly directed at

interference with the contract." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d

183, 191, 406 N.E.2d 445, 449 (1980)).

Defendants argue that these claims must be dismissed for failure to sufficiently plead the

third element, *viz.* whether they acted with the "sole purpose of harming the plaintiff" or used

"dishonest, unfair or improper means."  Defendants suggest that the customers had the right to

cancel their own contracts, that Eric Wahrsager had a "long, personal relationship" with these

customers himself, and that he cannot be prevented from "earning a living or contacting

customers who are open, notorious and generally available to the public." (Ds' Memo at 24.)

This argument, however, belies the factual backdrop of this lawsuit.  Plaintiff alleges that

the Wahrsager's efforts to interfere with NYMP's relationship with its customers came on the

heels of an alleged fraud scheme by NYMP's officers, which lead to the default in loan

obligations to the Lender and a collateral call for the assets that NYMP and its guarantors

pledged in support of the revolving loan.  Given these alleged facts, plaintiff has more than met his burden to allege a plausible claim that defendants interfered with these relationship in order to siphon customers to Central Station and thwart the Lender's efforts to retain these customers once it took over the business.  In light of the patent motivation present in the alleged facts, and the "extreme and unfair" pressure exerted on these customers in the form of threats that monitoring services on their property would be shut off imminently, plaintiff has alleged sufficient facts to allege the third element.  The remaining elements of their claim are likewise satisfied by plaintiff's pleading.  Defendants' motion to dismiss these claims as to Aaron and Eric Wahrsager is therefore denied.

The viability of plaintiff's same claims against USMP, however, stands on different footing.  The substance of these allegations state only that "NYMP Officers are sending former salesman of NYMP, who are now associated with [USMP], to NYMP customers in an attempt to cause those existing NYMP customers to cancel their existing contracts with NYMP, and switch accounts and sign up with [USMP]." (Am. Compl. ¶ 85.)  While this allegation may implicate the conduct of the "NYMP Officers," it does not impute liability to USMP.  Nowhere in the pleading is the connection between USMP and the other defendants ever established.  Plaintiff argues in his memorandum that "the Individual Defendants, the sole officers of USMP, knew of NYMP's existing client relationships, that those defendants inferred with those relationships, and that those defendants acted for the sole purpose of harming NYMP causing injury to NYMP."[16] (Pl.'s Memo at 15.)  However, these facts are nowhere to be found in the amended complaint.  As far as the pleading is concerned, USMP is a separate company, which happens to have former NYMP sales staff under its employ.  The paucity of facts connecting USMP with the other

---

[16] The amended complaint also later alleges under the trade secrets claim that USMP "has access to NYMP's confidential customer list through Eric R. Wahrsager."  Nevertheless, the pleading never alleges that this list was used by USMP to interfere improperly with NYMP's existing business relations.

defendants, events and conduct at issue prevents the tortious interference claims against USMP from moving forward.  Defendants' motion to dismiss the claims against USMP for tortious interference with business relations is therefore granted.

### IX.    MISAPPROPRIATION OF TRADE SECRETS AND UNFAIR COMPETITION

The twenty-third and twenty-fourth claims for relief assert allegations for misappropriation of trade secrets against Eric and Aaron Wahrsager, respectively. (Am. Compl. ¶¶ 168-73.)  Later, in the twenty-fifth through twenty-seventh claims, plaintiff alleges that through the misappropriation of these trade secrets, Central Station, Eric and Aaron Wahrsager, and USMP have all been enabled to unfairly compete against NYMP. (Am. Compl. ¶¶ 179-84.)

Plaintiff's unfair competition claims are based entirely on the claims for misappropriation of trade secrets, and, essentially, restate those very same claims.  Where these two types of claims are duplicative of each other, courts generally consider them to be a single cause of action.  *See Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 CV 1851, 2006 U.S. Dist. LEXIS 96005, *59 (E.D.N.Y. July 10, 2006)("Where an unfair competition claim duplicates a claim for misappropriation of trade secrets, the two claims generally rise or fall together.")(citing *Abernathy-Thomas Eng'g Co. v. Pall Corp.*, 103 F. Supp. 2d 582, 600 (E.D.N.Y. 2000)); *see also CBS Corp. v. Dumsday*, 268 A.D.2d 350, 353 (1st Dep't 2000). Although these two groups of claims are entwined, the Court will nevertheless evaluate each below, with the understanding that plaintiff may not ultimately prevail on both.

### a. *Misappropriation of Trade Secrets*

Plaintiff's "trade secret" claims suggest that defendants transferred to Central Station NYMP's, "residential customer list, rates charged to those customers, and history of responses to those customers," all of which are purportedly trade secrets. (*Id.*)  To bring a claim for the misappropriation of trade secrets, a plaintiff must allege that "(1) [defendant] possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990).  New York courts apply six factors to determine whether an item qualifies as a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Ashland Management v. Janien*, 82 N.Y.2d 395, 407, 624 N.E.2d 1007 (1993)(quoting Restatement of Torts § 757, comment b)(internal brackets omitted).

Plaintiff alleges that the Wahrsager brothers possessed the subject items (Am. Compl. ¶¶ 168-73), and that in transferring these items to Central Station, breached a duty of confidence owed to NYMP (Am. Compl. ¶¶ 169, 172).  This duty would attach to defendants here in their alleged capacity as officers and fiduciaries of NYMP. (*See* Am. Compl. ¶¶ 59, 60, 96, 102, 105, 111.)  Plaintiff also alleges that USMP "has access to, and is using [the customer list]," which it obtained through "improper means," namely through Eric Wahrsager. (Am. Compl. 174-78.)

Defendants attack these claims—as they do with several others—for failing to show "any proof" that these items are in fact trade secrets or that defendants possessed these items.[17] (Ds' Memo at 25.)  "Proof" aside, courts regularly consider customer lists to be trade secrets. Consider the Second Circuit's citation of the following excerpt from the Restatement of Torts on the definition of a trade secret:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . . A trade secret is a process or device for continuous use in the operation of the business.

*Lehman v. Dow Jones & Co.*, 783 F.2d 285, 297-98 (2d Cir.1986)(quoting in part Restatement of Torts § 757, comment b (1939)); *see also Lehman*, 783 F.2d at 298("Although the bulk of trade secret law relates to industrial information[,] some kinds of non-industrial business information -- for example, data related to customers, merchandising, cost and pricing, and systems and methods -- are also protected.")

A customer list, however, is not on its face a trade secret.  "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable. However, the owner is entitled to such protection only as long as he maintains the list in secrecy." *Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053, 1063 (2d Cir.1985)(internal citations omitted); *see Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392-93, 278 N.E.2d 636 (1972)("[W]here the customers are not

---

[17] Defendants' argument relating to the alleged possession of the items in question relies on the premise that the fraudulent conveyance claims should be dismissed. (Ds' Memo at 26.) As the fraudulent conveyance claims shall proceed, the Court need not address this argument.

known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to

protect customer lists and files as trade secrets.").

Ultimately, the inquiry here is a question of fact.[18] *See Ashland*, 82 N.Y.2d at 407.

Plaintiff has sufficiently pled that the items allegedly transferred to Central Station, *viz.*, the

customer list, including the rates charged to and correspondence with those customers, are trade

secrets.  Defendants' motion to dismiss these claims against Eric and Aaron Wahrsager and

USMP is therefore denied.


### b.  *Unfair Competition*

"The essence of an unfair competition claim under New York law is that the defendant

misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's

business idea either through fraud or deception, or an abuse of a fiduciary or confidential

relationship." *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001) (internal

quotation marks omitted).  A claim for unfair competition "has been broadly described as

encompassing any form of commercial immorality, or simply as endeavoring to reap where one

has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating

for the commercial advantage of one person . . . a benefit or property right belonging to another."

*Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d

1095, 1105 (2d Cir. 1982) (internal citations, alterations, and quotation marks omitted).

The New York Court of Appeals has set forth the "two theories of common-law unfair

competition" that New York courts "have long recognized": (1) "palming off," which refers to

"the sale of the goods of one manufacturer as those of another," and (2) "misappropriation,"

---

[18] Defendants' citation in their reply to the transcript of hearings in this case references material not properly
before the Court at this juncture. (*See* Ds' Reply at 8.)

which encompasses "[t]he principle that one may not misappropriate the results of the skill,

expenditures and labors of a competitor." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476-77, 880

N.E.2d 852 (2007)(quoting *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567-68, 161

N.E.2d 197 (1959)).  "Although unfair competition often involves misappropriation of trade

secrets or ideas, a claim may be based on misappropriation of client lists, internal company

documents, and business strategies 'if wrongful or fraudulent tactics are employed.'" Barbagallo

v. Marcum LLP, No. 11-CV-1358, 2011 U.S. Dist. LEXIS 123530, 30-31 (E.D.N.Y. Oct. 25,

2011)(quoting *Leo Silfen, Inc. v Cream*, 29 N.Y.2d 387, 278 N.E.2d 636 (1972)); *accord Berman*

*v. Sugo LLC*, 580 F. Supp. 2d 191, 209 (S.D.N.Y. 2008).

  The trade secrets involved here, namely the customer list and attendant data, were

allegedly obtained through an abuse of the Wahrsager brother's fiduciary and confidential

relationship with NYMP, and were allegedly used to give both Central Station and USMP an

unfair advantage over NYMP to NYMP's detriment.  Defendants counter these well-pled

allegations by arguing that they are based solely on the viability of plaintiff's claim for

misappropriation of trade secrets, which, as discussed, above may proceed.  Defendants' motion

to dismiss plaintiff's unfair competition claim is therefore denied.


  **X.** **INJUNCTIVE RELIEF**

  Plaintiff's twenty-eighth and penultimate claim seeks an order from this Court

permanently enjoining defendants and their related entities from "taking any affirmative actions

(including, but not limited to, using NYMP's confidential customer list to steal or solicit existing

customers of NYMP, shredding documents, or wiping computer hard drives) or from refraining

to take such necessary actions (such as providing routine and customary maintenance and

servicing of customer accounts), that would in any manner harm or injure the going concern value and the business operations [of] Central Station or NYMP."

A court may grant permanent injunctive relief if a plaintiff satisfies the following four factors: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

It is not clear what injunctive relief plaintiff will need from the Court at this point. Subsequent to filing the amended complaint, the Court approved the Receiver's proposed private sale of NYMP in the BoA action, dramatically changing the landscape for prospective relief in this action, particularly where it is intended to protect "the going concern value and the business operations" of NYMP. (Am. Compl. ¶ 187; s*ee* Order dated 10/19/11 in the BoA action.) Nevertheless, plaintiff has alleged a basis to allow the request for a permanent injunction to proceed and to deny defendants' motion to deny such relief at this time. Whether the injunctive relief sought has been mooted by the events that have transpired in this action over the course of many months of parallel litigation will be determined at a later stage in this case.

## XI. DECLARATORY RELIEF

Finally, plaintiff's twenty-ninth claim seeks a declaration that the assets alleged to have been fraudulently conveyed to Central Station are subject to a first priority security interest in favor of non-party Bank of America. (Am. Compl. ¶¶ 188-91.)

Under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the Court, "[i]n a case of actual controversy . . . may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought."  An "actual controversy" exists where there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir. 2005) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

In deciding whether to grant declaratory relief, a district court should consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

Here, plaintiff seeks a declaration regarding the status and rights of Bank of America, which is not a party to this action.  Plaintiff fails to articulate any basis for standing to request a declaration of the status of any liens under the loan agreement on behalf of Bank of America. Furthermore, though a determination of Bank of America's lien priority may facilitate the ultimate disposition of any assets determined to have been fraudulently conveyed vis-à-vis Bank of America, such a declaration does not serve a useful purpose in settling the specific controversy at issue in this case, namely, the ownership rights of the subject assets as between plaintiff and defendants.  To the extent that any "uncertainty" exists over Bank of America's lien status, plaintiff has failed to specify how the resolution of this uncertainty would affect the relationship of the parties to this action.  Defendants' motion to dismiss plaintiff's claim for declaratory judgment is therefore granted.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is granted as to plaintiff's claim for declaratory relief, and plaintiff's claim for tortious interference with business relations as to USMP only.[19]  Plaintiff has also withdrawn his claim for constructive trust.  All other claims may proceed. The moving defendants shall file their answer to the remaining claims within 14 days of the entry of this Order. *See* Fed. R. Civ. P. 12(a)(4)(A).  This case is respectfully referred to Magistrate Judge Lindsay for discovery and pretrial supervision.


SO ORDERED.

Dated: Central Islip, New York
       January 30, 2012

                              _____/s_____
                              Denis R. Hurley
                              Unites States District Judge

---

[19] All other claims for tortious interference with business relations may advance to the next stage of litigation.